51 P.3d 697 (2002)
183 Or.App. 293
In the Matter of Tyson Risland, a Minor Child.
STATE ex rel JUVENILE DEPARTMENT OF BENTON COUNTY, Respondent,
v.
Garth RISLAND, Appellant.
In the Matter of Tyson Risland, a Minor Child.
State ex rel Juvenile Department of Benton County, Respondent,
v.
Charlotte Risland, Appellant.
2547, 2547; A111914 (Control), A113152.
Court of Appeals of Oregon.
Argued and Submitted June 26, 2002.
Decided August 14, 2002.
*698 George W. Kelly, Eugene, argued the cause and filed the brief for appellant Garth Risland.
*699 James A. Palmer, Eugene, filed the brief for appellant Charlotte Risland.
Michael C. Livingston, Assistant Attorney General, argued the cause for respondent. With him on the briefs were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.
Before LANDAU, Presiding Judge, and DEITS, Chief Judge, and BREWER, Judge.
BREWER, J.
Father and mother appeal from a judgment that established juvenile dependency jurisdiction and included a dispositional order with respect to their nine-year-old son (child). The parents contend that the evidence at the dispositional hearing was insufficient to establish that the Department of Human Services (DHS)[1] previously had made reasonable efforts to make it possible for child to safely return home. ORS 419B.340(1). The parents also assert that the trial court improperly relieved DHS of a duty to make further reasonable efforts to reunify the family. ORS 419B.340(5); ORS 419B.470 to ORS 419B.476. Mother separately argues that the order unlawfully deprived her of her parental rights. On de novo review, ORS 419A.200(6)(b), we affirm.
Mother and father have three sons: G, D, and child, who is the youngest. The oldest son, G, lives with father. D was born in 1987 with methamphetamine in his system, and DHS began to provide services for the family at that time. In 1993, father was convicted of and sentenced to a term of imprisonment for several felonies, including drug manufacture, weapons possession, and child neglect. In the same year, mother was convicted of and sentenced to probation for possession of methamphetamine and driving under the influence of intoxicants (DUII). D first was placed outside his parents' home in 1994. The parents' marriage was dissolved in 1996.
In 1997, D was assessed by a counselor at Benton County Mental Health (BCMH), who concluded that D had experienced significant domestic violence in the parents' home, had witnessed a great deal of drug use and, in general, had been exposed to a highly unstable home life. The counselor met with mother and D on a number of occasions between 1997 and 2000. She diagnosed D as having "issues in the top ten percent of the severity of children's mental illness * * * as far as the complexity of more than one diagnosis and ongoing symptoms of the diagnosis staying pretty current and pretty consistent over time."
In 1998, father was released from prison on his 1993 convictions, subject to three years' post-prison supervision. Sometime after father's release, D and child began living with him. In September 1999, father was convicted of fourth-degree assault based on a domestic violence episode involving his girlfriend. D witnessed the incident.
After father's arrest, D and child were placed with mother. Child's caseworker described the ensuing period in the boys' lives as follows:
"During the following months both [boys] started acting out extremely. [D] was barred from the school grounds because of threatening behaviors and he was set up with a tutor[,] which he rarely attended those sessions. He was very impulsive, a great deal of anger. He began hanging out with older kids who were known drug users * * *. At the same time, [child] was having similar compulsive behaviors and a great deal of anger even to the point of assaultiveness. Both [boys] had done some property damage. [Mother] requested that [DHS] help her with the boys because she could not handle these behaviors."
Child's behavior at school remained explosive and uncontrollable and, eventually, he was removed from school. In December 1999, child was hospitalized for psychiatric evaluation and treatment. Mother removed child from the hospital against medical advice, at which point the family was referred once again to BCMH for assistance. BCMH arranged for mother and child to see a mental health physician "for medication and medication *700 management." After some services were provided, mother told the BCMH caseworker that, because of her sons' violent outbursts, she could not handle them. BCMH and a DHS representative then devised a domestic violence safety plan for mother, primarily to address the children's having witnessed domestic violence between mother and her boyfriend.
In January 2000, the parents entered into a voluntary custody agreement with DHS. In consideration of the parents' agreement to place child in DHS custody, DHS agreed (1) to "place [child] in a home or facility that is operated by the State or is certified or licensed to care for children," and (2) "[t]o develop with [the parents] an individualized service plan to provide for [child's] needs, and services for the family." Pursuant to the agreement, child was placed in a shelter home on January 6. BCMH continued to provide services to mother and both boys through March, after which it assumed a "consulting role." In March, child was diagnosed by a psychologist as having "Posttraumatic Stress Disorder, Oppositional Defiant Disorder, Disorder of Written Expression and Phonological Disorder, along with stressors including history of domestic violence and chaotic upbringing." After numerous contacts, the BCMH caseworker concluded that, in spite of mother's obvious love and concern for her sons, she could not provide "the level of skills necessary to deal" with them. In May, child was moved to a group home.
In May, DHS held a family decision meeting with the parents, their attorneys, child's grandmother, father's post-prison supervision officer, child's DHS caseworker, and child's foster parent. At that time, the goal for child was reunification with a parent. Mother signed a service agreement with DHS on May 23. Under the agreement, mother received family counseling with child, was provided with parenting classes, and agreed to attend weekly parenting group meetings. On May 25, mother had a positive urinalysis (UA) test for methamphetamine. In June, both parents voluntarily extended the custody agreement. In August, mother was sanctioned for a probation violation. Mother had failed to report for UA testing for a month after her positive UA test in late May. Mother also had failed to report to her probation officer as required on two occasions in July. On August 2, mother was referred by her probation officer to cognitive skills classes and to BCMH for personal counseling.
According to father's post-prison supervision officer, father performed very poorly on supervision after his release from prison in 1998. He refused to enter a long-term residential drug treatment program, despite having been ordered to do so by the officer and by the court. Although father eventually entered an outpatient treatment program, he "constantly refused and attempted to manipulate his way out of" the program. When father finally agreed to enter residential treatment in January 2000, "he was immediately terminated because he had a dirty [UA] for methamphetamine." In addition, father did not have a permanent residence, and he refused to participate in a domestic violence program as directed by the probation court. Father did participate in an anger management and drug and alcohol treatment program that he entered on his own. At the time of the jurisdictional hearings, father's post-prison supervision officer also intended to require him to participate in domestic violence classes after his other treatment had sufficiently progressed.
On July 18, 2000, DHS filed separate dependency petitions with respect to D and child. The petitions alleged that the children's welfare was endangered because "[b]oth parents have long histories of drug and alcohol abuse * * *. Both parents * * * have failed to comply with the conditions of their probation." The juvenile court held joint hearings on the petitions on July 19, August 16, and September 6. Both parents testified that they wanted child reunified with the family, and the court found that child was bonded to the parents. Mother testified that her last positive UA occurred in May 2000. Mother stated that she was willing to cooperate with DHS by participating in services. However, she also testified that she thought the children could be returned home and that they would be better off if DHS were not involved in their lives.
*701 On September 15, the court issued a letter opinion, including the following findings:
"1. Both these boys have multiple and severe emotional and learning disorders. For example, the elementary school counselor testified that these boys were among the most emotionally disturbed children she had ever encountered [in her career].
"* * * * *
"The parents have very significant personal issues to deal with. For example, at the first hearing date, the mother represented to the Court that she was ready to assume custody of [child], but by the last hearing date her situation changed and she testified that she was not able to care for [child] and felt he should go to live, along with [D], with his father. The mother is on supervised probation and had a positive UA for methamphetamine a[s] recently as May of this year.
"The father is also on supervised probation and has to deal with domestic violence and substance abuse (methamphetamine) issues. His prior probation officer reports that [father] was a very poor probationer. In fairness, [father's] current probation officer gives him positive marks and [father] recently completed an intensive counseling program. The father spent 30 days in jail on a probation violation in early summer. The father is a single parent and given his own issues, just cannot provide adequate supervision, direction, and structure for either of these children.
"Neither parent really has any real insight into how seriously these children have been affected by their parents' lifestyle nor what level of effort and structure it will take to give the children a chance in life. In the past, the parents have at times not been supportive of [DHS] programs. The parents caused [D] to prematurely leave the Waverley in-resident program. Recently, when [child] was placed in Providence, the mother, after discussing the situation with the father, took [child] out of the placement against the advice of the treating doctors. The mother later agreed to a voluntary placement for [child], but only when he was clearly out of her control. At prior hearings, she has indicated that she wants to have him at home even though [DHS], the [Court Appointed Special Advocate], and the professionals feel he needs to stay longer. Quite frankly, the [parents'] attitudes seem to be that if the boys just could go back to live with the father and if [DHS] would just get out of their lives, everything would be just fine. Unfortunately, this is totally unrealistic and should be apparent given the past difficulties the boys have had when living with their parents.
"[DHS] and Benton County Mental Health have given and offered the parents considerable services and assistance through the years. In addition, each of these parents has been on supervised probation for a number of years and each is currently on supervised probation during which time they have received, and continue to receive extensive services, direction, and help." (Emphasis added.)
On October 2, the court entered an order finding that the allegations in the petition had been proved, assuming jurisdiction over child, and placing him in the physical and legal custody of DHS. The order further provided:
"(3) [DHS] has made reasonable efforts to make it possible for [child] to be returned to his parents;
"(4) [DHS] shall not be required to make any further efforts to look to either [mother] or [father] as a permanent resource for [child];
"(5) Further services by [DHS] would not make it possible for [child] to return to either parent's care and custody within a reasonable period of time and further delay would not be in the best interest of [child];
"(6) If [DHS] determines that [child] is not adoptable, the plan for [child] shall be permanent foster care or guardianship, preferably with a relative or with a family that will allow regular visitation between [child] and [parents] and [child's grandmother]."
In September, while in foster care, child experienced severe psychological deterioration *702 and was admitted to a psychiatric hospital for about one week. On October 4, he entered a secure psychiatric residential treatment facility for "assessment and stabilization." His DSM-IV Axis I diagnosis was "Attention Deficit Disorder, Posttraumatic Stress Disorder, Oppositional Defiant Disorder, Phonological Disorder, and Parent-Child Relational Disorder." His Axis IV diagnosis was "[r]emoval from home, multiple psychiatric hospitalizations, history of witnessing domestic violence, separation from family members, school failure and learning difficulties, individual education needs, inadequate support network for level of disability." The intake psychiatrist summarized her recommendations, stating that "[child] will require placement in a residential treatment program to address psychiatric illness that has not been responsive to brief psychiatric hospitalizations, outpatient mental health services and outpatient medication management services over the last year."
On October 9, the juvenile court sent an e-mail to counsel, advising them as follows:
"The orders the court signed are an accurate statement of the court's findings and conclusions. We need an order in place until the disposition hearing. The parties will have the right to state their positions at the [disposition] hearing on the issue of whether either the form of the order or the court's decision should be altered. But, we have already had a lengthy hearing, lengthy closing arguments and the court took the matter under advisement and gave it a considerable amount of thought before reaching its decision. The court is not going to re-open the jurisdictional phase of the proceeding, but will, as mentioned above, let the parties at the disposition hearing state their objections to the form of the order or the court's decision."
On November 19, father was arrested for DUII and was sentenced to 30 days in jail on a probation violation. D returned to live with father when he was released from jail.
On December 20, the court held a dispositional hearing for D and child. Mother had relapsed into alcohol use a month before the hearing and had returned to an aftercare program. Both parents were regularly visiting child at the time of the hearing. Although the court believed that D also needed residential psychiatric treatment, the court decided to dismiss the dependency petition with respect to D, because both D and the parents were opposed to such treatment. In view of the severity of child's problems, DHS did not consider him to be adoptable. Because it believed that no relative placement was appropriate, DHS anticipated that child would be placed in permanent foster care after completing residential psychiatric treatment. The attorneys for the parents objected to the court's making any permanency decision at that time. In particular, mother's attorney stated:
"[October 2000] is the time the child came into the jurisdiction and then there has to be a permanency hearing after that. We object to the idea that you can come into court basically on a first time adjudication and * * * suddenly come out of it with a permanency issue. Procedurally, we don't believe that that's allowed by law. * * * So we object to any permanency ruling on [child] at this point."
On January 16, 2001, the court entered a further "Judgment of Jurisdiction [and] disposition" that provided, in part:
"(4) [DHS] shall not be required to make any further efforts to work with either the mother or father or other family members to be a permanent resource for [child] except as noted in paragraph 6 below;
"(5) [DHS] shall attempt to find a permanent resource where [child] can have regular contact and visitation with his parents and grandparents;
"(6) If the mother or father or any other family member comes forward to [DHS] and demonstrates that this person can be supportive of [child's] need for residential placement; can provide a stable home where it is likely [child] can live for an extended period of time; can provide the necessary parenting ability; and can [ensure] that [child] will receive appropriate counseling and education, then [DHS] may request the court reconsider *703 its decision of permanent placement outside of the family;
"(7) The parents are specifically ordered to do the following:
"(a) Cooperate with [DHS] to [ensure] that [child] gets the maximum benefit from his in-resident placement;
"(b) Follow [DHS's] instructions regarding their child's behavior during visitation;
"(c) Participate in and successfully complete any substance abuse or parent training requested by [DHS];
"(d) If [child] runs away from placement, to notify [DHS] within one hour of having contact with [child]; and
"(e) Attend counseling as directed by [DHS] designed to make the parents aware of how significant [child's] education and emotional needs are and the home setting [child] needs to be in to address these issues." (Emphasis added.)
The parents appeal from the foregoing judgment.[2] Both parents initially contend that the juvenile court erred in determining, pursuant to ORS 419B.340(1), that DHS previously had made reasonable efforts to reunify the family.
When a juvenile dependency petition is filed, the court must, within 60 days (unless the period is extended for good cause), hold a hearing on the petition and enter an "appropriate order directing the disposition to be made of the case." ORS 419B.305; ORS 419B.325(1). If the court awards custody to DHS, and if the child has been removed from the parents' home prior to the entry of the order, the dispositional order must "include a determination whether [DHS] has made reasonable or active efforts to make it possible for the child to safely return home. In making [that determination], the court shall consider the child's health and safety the paramount concerns." ORS 419B.340(1).
On de novo review, we first find that DHS made reasonable efforts before the dispositional hearing to make it possible for child to safely return home. Especially after child was hospitalized in late 1999, DHS made considerable efforts to reunify the family. It combined appropriate services to the family with the array of services provided to the parents under their respective terms of probation and post-prison supervision. Although the parents on occasion made halting progress toward reunification, each relapsed into conduct and conditions that were, in significant part, responsible for the multiple psychiatric, behavioral, and educational challenges confronting child. The court was required, in determining whether reasonable efforts had been made, to put child's "health and safety" first. It did just that.
We turn to the parents' primary argument that the juvenile court's order relieving DHS of a duty to make further reasonable efforts to reunify the family was erroneous because it amounted to a permanency decision that could not be made at the dispositional phase of the proceeding. We address that argument by examining the relevant statutory framework.
ORS 419B.340(5) provides:
"(5) If a court determines that one of the following circumstances exist[s], the juvenile court may make a finding that [DHS] is not required to make reasonable efforts to make it possible for the child to safely return home:
"(a) Aggravated circumstances including, but not limited to, the following:
"(A) The parent by abuse or neglect has caused the death of any child;
"(B) The parent has attempted, solicited or conspired, as described in ORS 161.405, 161.435, or 161.450 or under comparable laws of any jurisdiction, to cause the death of any child;
"(C) The parent by abuse or neglect has caused serious physical injury to any child;
"(D) The parent has subjected any child to rape, sodomy or sexual abuse;
"(E) The parent has subjected any child to intentional starvation or torture;

*704 "(F) The parent has abandoned the child as described in ORS 419B.100(1)(e); or
"(G) The parent has unlawfully caused the death of the other parent of the child;
"(b) The parent has been convicted in any jurisdiction of one of the following crimes:
"(A) Murder of another child of the parent, which murder would have been an offense under 18 U.S.C. 1111(a);
"(B) Manslaughter in any degree of another child of the parent, which manslaughter would have been an offense under 18 U.S.C. 1112(a);
"(C) Aiding, abetting, attempting, conspiring or soliciting to commit an offense described in subparagraph (A) or (B) of this paragraph;
"(D) Felony assault that results in serious physical injury to the child or another child of the parent; or
"(c) The parent's rights to another child have been terminated involuntarily."
ORS 419B.340(6) provides:
"If, pursuant to a determination under subsection (5) of this section, the juvenile court makes a finding that [DHS] is not required to make reasonable efforts to prevent or eliminate the need for removal of the child from the home or to make it possible for the child to safely return home, and [DHS] determines that it will not make such efforts, the court shall conduct a permanency hearing as provided in ORS 419B.470 no later than 30 days after the judicial finding under subsection (5) of this section."
ORS 419B.340(6) makes clear that, if the court makes a finding under subsection (5), a permanency hearing is the next step in the judicial process after disposition. However, it is not an inevitable next step. A permanency hearing must be held within 30 days of disposition only if DHS determines that it will not make reasonable efforts to reunify the family. ORS 419B.470 provides, in part:
"(1) The court shall conduct a permanency hearing within 30 days after a judicial finding is made under ORS 419B.340(5) if, based upon that judicial finding, [DHS] determines that it will not make reasonable efforts to reunify the family.
"(2) In all other cases when the child is in substitute care, the court shall conduct a permanency hearing no later than 12 months after the child was found within the jurisdiction of the court under ORS 419B.100 or 14 months after the child was placed in substitute care, whichever is earlier.
"* * * * *
"(4) Unless good cause otherwise is shown, the court shall also conduct a permanency hearing at any time upon the request of [DHS], an agency directly responsible for care or placement of the child, parents whose parental rights have not been terminated, an attorney for the child, a court appointed special advocate, a citizen review board, a tribal court or on its own motion. The court shall schedule the hearing as soon as possible after receiving a request." (Emphasis added.)
The court is required to notify the parents in advance of any permanency hearing. ORS 419B.473.
Although ORS 419B.470(4) authorized the court on its "own motion" to conduct a permanency hearing at "any time," the December 20 hearing was not such a proceeding. In its October 4 e-mail to counsel, the court informed the parties that it next intended to hold a dispositional hearing. It did not provide the parties with notice, as it would have been required to do by ORS 419B.473, that it intended to conduct a permanency hearing. Moreover, although the two types of hearings often involve overlapping issues, the dispositional hearing that the court conducted was not concerned with other issues that a permanency hearing must address. See, e.g., ORS 419B.476(2)(b) (if the case plan at the time of a permanency hearing is something other than to reunify the family, the court must "determine whether [DHS] has made reasonable efforts to place the child in a timely manner in accordance with the plan and to complete the steps necessary to finalize the permanent placement of the child"). In short, the court did not hold a permanency *705 hearing but, instead, held a dispositional hearing.
We next consider whether the trial court's decision at that hearing to excuse further reasonable efforts by DHS to make child's return home possible was within its dispositional authority under ORS 419B.340. As quoted above, ORS 419B.340(5) provides three categories of circumstances under which a juvenile court is authorized to excuse DHS from making further reasonable efforts to reunify a child with the child's parents: (1) "aggravated circumstances, including, but not limited to" seven specified types of circumstances, ORS 419B.340(5)(a)(A) to (G); (2) a parent's conviction of certain criminal offenses, ORS 419B.340(5)(b); and (3) the existence of a judgment involuntarily terminating a parent's rights to another child. ORS 419B.340(5)(c).
There is no evidence in the record that any of the circumstances specifically enumerated in ORS 419B.340(5)(a)(A) to (G) existed or that either paragraph (5)(b) or (5)(c) applied in this case. However, the list of "aggravated circumstances" contained in paragraph (5)(a) is not exclusive. The question therefore is whether the facts of this casealthough not constituting any of the circumstances expressly enumerated in ORS 419B.340(5)(a)constitute "aggravated circumstances" within the statutory meaning of that term. To answer that question, we apply the methodology of statutory construction set out in PGE v. Bureau of Labor and Industries, 317 Or. 606, 610-11, 859 P.2d 1143 (1993), beginning with the text of the statute.
First, the ordinary meaning of the verb "aggravate" is "to make worse, more serious, or more severe: INTENSIFY." Webster's Third New Int'l Dictionary, 41 (unabridged ed. 1993). Accordingly, as applied in a juvenile dependency proceeding to circumstances bearing on a determination whether to remove a child from a parental home or whether, conversely, a child may be "safely" returned home, "aggravated" circumstances are those involving relatively more serious types of harm or detriment to a child. That interpretation is confirmed by the aggravated circumstances that are specifically enumerated in ORS 419B.340(5)(a), involving, among other things, a parent having caused a child's death or serious physical injury or having subjected a child to rape or other sexual abuse, intentional starvation or torture, or abandonment. See State v. Johnston, 176 Or.App. 418, 423, 31 P.3d 1101 (2001) (under principle of ejusdem generis, the general category will partake of the same characteristics as the specifically enumerated examples).
Next, it is significant that ORS 419B.340(5)(a) refers to aggravated "circumstances," rather than to the aggravated actions and conditions of a parent. See Webster's at 410 (defining "circumstance" in part as "the total complex of essential attributes and attendant adjuncts * * * the sum of essential and environmental characteristics"). That usage indicates that the legislature was concerned, not only with the parents' actions and conditions, but also with the results of those actions and conditions, including effects, direct and indirect, on a child.
Moreover, ORS 419B.340(5)(a) expressly provides that the "aggravated circumstances" enumerated therein may be found in regard to "any" child, not merely the child who is the subject of the dependency petition.
Finally, the legislature expressly included in ORS 419B.340(5)(a) at least two "circumstances" that could involve nonintentional conduct by a parent toward a child, namely, parental "neglect" resulting in a child's death or serious physical injury. Accordingly, the general category of "aggravated circumstances" is not limited to intentional conduct by a parent toward a child.
It is not necessary or possible in this case to determine the entire universe of "aggravated circumstances" within the meaning of ORS 419B.340(5)(a), because we conclude that such circumstances clearly are present here. In particular, although the record does not reflect that the parents have caused child (or any other child) to suffer any of the harms expressly enumerated in ORS 419B.540(5)(a), it discloses that D has suffered severe mental injury as a result of his exposure to significant domestic violence, the *706 parents' drug use, and a highly unstable home life. The record also demonstrates that child has suffered serious psychological and social damage including, among other disorders, posttraumatic stress disorder, oppositional defiant disorder, and parent-child relational disorder and that those disorders were caused, in substantial part, by the parents' conduct, including child's witnessing domestic violence. In addition, the parents' harmful actions and conditions have not been significantly remediated, even though extensive services were provided to them before this proceeding was commenced. Consistently with our understanding of ORS 419B.340(5)(a) as described above, we conclude that the circumstances here, in their totality, are "aggravated." It follows that, based on the existence of those circumstances, the juvenile court was authorized to find that DHS was not required to make reasonable efforts to make it possible for child to safely return home.
We caution that, in concluding that the circumstances here are "aggravated" within the meaning of ORS 419B.340(5)(a), we do not rely solely on the parents' actions and conditions. As father observes, the nature and scope of the parents' problems are not unlike many examples of parental circumstances that would support the court's dependency jurisdiction yet still require DHS to make further reasonable efforts to reunify the family. However, the circumstances here are "aggravated" in two particular respects: (1) Child's psychological and social problems attributable in significant part to the parents' actions and conditions are especially serious; and (2) the parents' harmful actions and conditions that contributed to those problems for the purposes of ORS 419B.340(5)(a) persist despite extensive efforts to remediate them before the court assumed jurisdiction.
Finally, we reject mother's argument that the dispositional order unlawfully impaired her parental rights. The order is subject to modification should the parents' circumstances change. ORS 419B.449. In addition, DHS has discretion under the order to provide further services to the parents. Alternatively or in addition, both parents may be eligible to receive probation and post-prison supervision services that may assist them in addressing their substance abuse and mental health issues. Nor does the order preclude DHS from adopting a plan for reunification. ORS 419B.343(1); ORS 419B.470(1). Despite the provision relieving DHS of the duty to make further "reasonable efforts," the order calls for extensive ongoing contact between child and the parents. That and other features of the order suggest that an experienced juvenile court judge has sent the parents a "wake up" call meant to get their attention before it is too late to salvage their parental relationship with child. Disposition is not a "one size fits all" remedy. Ultimately, the court was required to make a disposition that was "appropriate" under the circumstances. ORS 419B.325. It did so in this case.
Affirmed.
NOTES
[1] DHS comprises, in part, the state child protective services agency formerly known by other names, most recently, the State Office for Services to Children and Families (SCF). For ease of reference, we refer to DHS throughout this opinion.
[2] Father also filed a separate notice of appeal from the October 2 jurisdictional order, but he does not make any separate argument on appeal with respect to that order.