Argued and submitted July 20, reversed October 18, 2006

In the Matter of
Kimbra Shugars,
a Minor Child.

STATE ex rel DEPARTMENT OF
HUMAN SERVICES,
*Respondent,*

*v.*

Crystal SHUGARS
and Edgar Shugars,
*Appellants.*

0000739JV1; A129329

145 P3d 354

See also, 202 Or App 302, 121 P3d 702.

James J. Spindor argued the cause and filed the brief for appellant Crystal Shugars.

James A. Palmer argued the cause and filed the brief for appellant Edgar Shugars.

Denise G. Fjordbeck, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General.

Before Armstrong, Presiding Judge, and Haselton* and Rosenblum, Judges.

ARMSTRONG, P. J.

___

* Haselton, J., *vice* Linder, J.

**ARMSTRONG, P. J.**

Mother and father appeal from a judgment authorizing DHS to pursue adoption as the permanency plan for their daughter, K.[1] In that judgment, the juvenile court found that the Department of Human Services (DHS) had made reasonable efforts to reunify K with her parents and that neither parent had made sufficient progress toward meeting expectations for K's return to their home. ORS 419B.470 - 419B.476. Both parents contend that the evidence does not support changing the permanency plan for K from reunification to adoption. On *de novo* review, ORS 419A.200(6)(b), we agree and reverse.

A brief chronological overview of the case is helpful. K was brought into state care, along with her two brothers, T and J, on September 26, 2003. K was eight years old at the time, T was almost three, and J was 20 months. Dependency jurisdiction over all three children was established by the juvenile court in March 2004, and parents appealed that decision. While that appeal was pending, the case proceeded in the juvenile court. After a permanency hearing that concluded in March 2005, the juvenile court entered a judgment determining that parents had made sufficient progress to continue with the plan to return all three children to their care, anticipated in April 2005. Accordingly, on April 22, K and her siblings were returned to parents' care. On June 2, they were again removed from the home based on two concerns: (1) that parents had changed K's medication without first notifying DHS; and (2) that they had used physical discipline with the children contrary to DHS rules. A shelter hearing was held on June 3 and a permanency hearing followed on June 27, July 1, and July 8, 2005. After the permanency hearing, the court issued a judgment authorizing a change in the permanency plan for the children from "return to parent" to "achieve adoption"; parents now appeal that

---

[1] That judgment also pertained to the couple's two younger children, T and J. However, based on our decision in *State ex rel Dept. of Human Services v. Shugars*, 202 Or App 302, 121 P3d 702 (2005) (*Shugars I*), reversing the juvenile court's establishment of dependency jurisdiction over T and J, the juvenile court set aside the judgment as to those children. Accordingly, we dismissed mother's and father's appeals as they relate to T and J.

judgment. We subsequently decided parents' earlier appeals, affirming the court's dependency jurisdiction over K, but reversing it as to T and J. *State ex rel Dept. of Human Services v. Shugars*, 202 Or App 302, 121 P3d 702 (2005) (*Shugars I*).

Our opinion in *Shugars I* detailed the basis for the court's jurisdiction over K:

"On September 29, 2003, DHS filed a petition for jurisdiction over the three children, alleging:

" 'A.   On or around 09-26-03, the child, [T], had an unexplained injury in the form of a bruise and swelling to his forehead. This condition places the children, [K], [T], and [J], under a threat of harm.

" 'B.   The children, [K], [T], and [J], have been victims of neglect in that the parents, Edgar and Crystal Shugars, have failed to provide appropriate and consistent medical treatment for the children. This condition places the children under a threat of harm.

" 'C.   On or around 09-26-03, the father, Edgar Shugars, exposed the child, [K], to emotional abuse by behaving irrationally and involving her in a volatile situation in which he took [K] in violation of a court order, eluded police while driving recklessly with her in the car, and refused to pull the car over until the police had him surrounded. Mr. Shugars refused to exit the vehicle with [K] and the police were forced to extract him from the vehicle at gunpoint while [K] was present. This condition places the children under a threat of harm for further emotional abuse.

" 'D.   The parents, Edgar and Crystal Shugars, have a history of involvement with DHS/Child Welfare due to issues of neglect and threat of harm. DHS/Child Welfare has offered numerous remedial services to the family, including Intensive Home Based Services which the family completed, however, most services offered have been refused by Mr. and Mrs. Shugars and they continue to engage in behaviors that are neglectful to the children and place the children under a threat of harm.' "

*Shugars I*, 202 Or App at 309-10. In March 2004, the juvenile court found that the state had not established the allegation

of paragraph A, but it asserted jurisdiction over all of the children based on paragraphs B, C, and D of the petition. *Id.* at 310-11.

On appeal, we concluded that the juvenile court properly exercised jurisdiction over K based on paragraphs B and C of the petition but erred in exercising jurisdiction over K based on paragraph D of the petition.[2] *Id.* at 322. Regarding the allegations in paragraph B, we stated:

> "[W]ith respect to K[,] there is cogent and persuasive evidence of parents' failure to follow through on medical advice. For example, K had, and has, special needs that require careful and consistent follow-through with psychological and psychiatric treatment. As noted, K was diagnosed with both attention deficit and bipolar disorders and exhibited behavior problems from a very early age. Although DHS emphasizes that, on several occasions, parents discontinued medications without first consulting K's physician, we place less emphasis on that point, given that the evidence demonstrated that the medications at issue were not working and that parents sought new medications. Still, of substantial concern is that parents failed to follow through on advice given by K's therapist concerning tracking of K's moods, and also failed to follow through on advice on how to address some of K's ongoing behavior problems. We conclude that parents' persistent failure in those respects constituted neglect of a medical need sufficient to warrant the imposition of dependency jurisdiction."

*Id.* at 312-13.

Based on the totality of the circumstances, including K's special emotional needs, we also concluded that father's conduct in the events described in paragraph C presented a reasonable likelihood of future harm to K and thus warranted the exercise of jurisdiction.[3] *Id.* at 316-18. We did not, however, agree with the juvenile court that the allegations of

---

[2] As noted above, we also reversed the establishment of dependency jurisdiction over T and J. *Shugars I*, 202 Or App at 322.

[3] We noted, however, that the material facts as established at the jurisdictional hearing differed substantially from those alleged in that provision of the petition. We found, for example, that father did not elude police "while driving recklessly" nor was he ever "surrounded" by police. *Id.* at 316.

neglect in paragraph D were sufficient to support jurisdiction. With regard to those allegations, we concluded:

"Parents did, indeed, have a 'history of involvement' with the agency before September 26, 2003. We emphasize, however, that all of that 'involvement' occurred in a context in which DHS had *not* acquired jurisdiction over the children. That is, at the time of the filing of this petition, DHS had never previously *established* 'neglect and threat of harm'—and, indeed, the court had dismissed the only prior (2001) petition alleging such conditions. Further, evidence in the record indicates that parents—perhaps mother more so than father—have not only availed themselves of some offered services, but have actually benefitted from those services.

"With those qualifications, we address the neglect allegations of paragraph D. In that regard, we agree with the trial court that parents were deficient in failing to address 'the smell issue' for all three children. Nevertheless, as amplified below, we conclude that parents' default in that regard is insufficient to support the imposition of jurisdiction as to any of the children.

" 'The smell issue,' as the trial court characterized it, refers to the children smelling of cat urine. Both parents and many members of both parents' extended families adamantly denied that any of the children ever smelled of cat urine. However, virtually everyone else who came into contact with the children noted the odor. The odor was distinct enough, and unpleasant enough, to cause social problems for K at school, as well as contributing somewhat to her school attendance problems. Moreover, it can be reasonably assumed that T and J may eventually experience some of the same difficulties, given that parents seem unable or unwilling to recognize the nature of the problem and remedy it.

"Thus, the question is whether parents, by allowing the children to frequently smell of cat urine, have 'place[d] the children under a threat of harm.' On balance, we conclude that the evidence, while disturbing, is insufficient to establish jurisdiction over the children on that basis."

*Id.* at 319-20 (emphasis in original).

With that background in mind, we detail the facts leading up to the permanency hearing judgment.[4] After K was placed in foster care in September 2003, a permanency plan of "return to parent" was established, along with a concurrent plan of adoption. It is unclear from the record what services, if any, DHS provided to parents between September 2003 and September 2004 to reunite the family,[5] but, eventually, both parents were given psychological evaluations and completed a 17-week parenting program led by Judy Cooper.[6] The program taught nonviolent parenting techniques, such as a "chore and reward" system of discipline and the use of "time-outs." Cooper testified that parents were intellectually capable of parenting and did well "on paper" but did not personalize the information they were given or incorporate it into their lifestyle. Instead, parents made consistent statements that they did not belong in the program. Cooper also felt that parents "didn't buy into" the program of not using physical discipline because they never stated in class that they would not use it. At the end of the program, Cooper recommended, as she "almost always" did, intensive home-based services to determine whether parents could demonstrate their ability and desire to use the skills that they had learned in the parenting classes.

Consequently, DHS contracted with Amy Ross, a mental health therapist, to provide in-home behavioral therapy for parents. Ross's goals in working with the family were to (1) identify and address issues that prevented the children from returning home; (2) identify any barriers in parents' ability to apply information from the parenting classes and other information that they had received; (3) determine what assistance was needed to make the home a safe and clean

---

[4] We consider facts related to T and J to the extent that they are inseparable from those related to K or necessary to evaluate the risk of harm to K. *See, e.g., State ex rel Juv. Dept. v. Brammer*, 133 Or App 544, 549, 892 P2d 720, *rev den*, 321 Or 268 (1995) (a child may be removed from an abusive environment based on evidence of abuse of any child).

[5] In September 2004, the juvenile court issued an "Order Regarding Reasonable Efforts," finding that DHS had not made reasonable efforts to remediate the circumstances that caused the court to take jurisdiction.

[6] Parents were also referred to an effective living skills group program but were later determined not to be appropriate candidates for the program because they were not receptive to the information.

environment; and (4) focus on the individual needs of the children and parents' ability to meet those needs.

Ross met with parents on 13 occasions between February 4, 2005 and May 28, 2005. During several visits, she discussed with them the inappropriateness of using physical punishment with the children because it is "not an appropriate form of discipline, to physically punish children" and because "these children * * * have special needs in that they've had previous abuse issues * * * [s]o hitting them or spanking them in any way is going to cause more harm than good."[7] She explained to parents that using physical discipline with a child who has been abused can be particularly detrimental in that it can, for example, cause post-traumatic stress disorder symptoms to emerge. Speaking generally, she also opined that, in certain situations, a slight spank on the backside with an open hand "is not completely inappropriate or ineffective."

At the same time, DHS contracted with Gabriel Gomez, a behavior management consultant. Gomez began weekly sessions with the family on January 28, 2005. During the time that the children were in foster care, they were transported to parents' home for these sessions, each of which lasted between one hour and two hours. According to Gomez, his level of intervention was relatively low during these visits so that parents would have an opportunity to apply the parenting methods that they had learned. Instead, he made notes of his visits, which he later shared with parents.

Gomez testified that he stressed at "virtually every visit" with parents the importance of using nonviolent parenting methods and neither parent resisted it, either verbally or intellectually. He also addressed issues of structure and attachment; for example, he provided recommendations to parents for organizing their living space in such a way as to increase opportunities for parents to engage in play with the

---

[7] Ross's reference to the children's "previous abuse issues" has two sources. First, the record reflects that T was severely abused while in foster care. In addition, Ross testified that she understood that the children "had histories of abuse while in [parents'] home"; however, as noted above, physical abuse was not established as a basis for dependency jurisdiction over any of the children.

children. He specifically addressed with both parents, and on more than one occasion, the importance of nurturing K and providing her with consistent care, instead of depending on medication to "fix" her problems.[8] Gomez testified that father's behavior in this area became "consistently positive" over the course of Gomez's visits, while mother's progress fluctuated.

Gomez observed that, when parents were interacting with the children in the intense setting of hourly visits with a high level of scrutiny, they responded well to his suggestions. For example, he recalled several visits where he observed parents implementing a suggestion he had offered at an earlier visit. He also noted that, over the course of his visits before the children returned home, parents were increasingly prepared to meet their needs. For example, father often had prepared a healthy, balanced meal for the children. Mother was also present, sometimes assisting father in preparations for dinner, sometimes "at a distance."

A permanency hearing was commenced on February 28 and concluded on March 14, 2005, at which time the juvenile court found that both mother and father had made sufficient progress toward "meeting the expectations set forth in the service agreement, letter of expectation and/or case plan" and that DHS had made reasonable efforts toward reunification of the family. Accordingly, the court continued "return to parent" as the permanency plan for the children, with an anticipated completion date of April 2005.

According to Lisa Rutter, K's DHS caseworker, parents were at that time in compliance with everything that DHS had required of them.[9] Ross and Gomez also agreed with the decision to return the children home. In Gomez's opinion, parents needed an opportunity to demonstrate that they could apply the parenting skills that they had learned outside of a visitation setting. Ross's recommendation was

---

[8] At the time, K was taking the medication Adderall to treat her bipolar disorder and attention deficit hyperactivity disorder.

[9] Although father disputed the results of his psychological evaluation and did not complete the individual counseling that was recommended, Rutter testified that this was not a problem "as far as the children going home" and DHS was "going to have another evaluation."

based on successful changes that parents had made to provide a cleaner home environment for their children. She also noted that they had made progress in that they "engaged in discussions about appropriate ways to interact and discipline their children."

According to Rutter, parents were informed at a family decision meeting before the children's return that they were not allowed to use physical discipline with the children and that they should not change K's medication without receiving prior input from DHS.[10] Mother disputes that she was informed of either of these conditions. Father disagrees that he was told that all physical discipline was prohibited.

On April 22, 2005, the children were returned to parents' care. Both Ross and Gomez continued to work with the family. Ross found that mother and father "seemed to have much difficulty continuing on with progress to fully reach" their goals with the daily demands and increased stress of caring for three young children. In the three visits that Ross conducted after the children were returned home, she never saw parents using physical punishment to discipline the children but, during two of the visits, she did observe a lot of yelling, mainly from mother. As she described it, on those occasions, the children were running around unsupervised on the upper floor of the home, while mother sat on the couch downstairs and yelled at them to come down. As Ross stated, "it wasn't abusive, but it * * * wasn't effective." Ross was also concerned that the children could get into something harmful while they were alone upstairs, although she acknowledged that she was not aware of any specific danger. Regarding father, she testified that she had personally observed father implement a recommended parenting technique for working with T.

Gomez had five sessions with the family after the children came home; K was present for two of them. He observed that parents had difficulty keeping up with the children and testified that the strengths that he saw earlier in parents were not as evident during these visits. The children were anxious and overactive when he arrived, even if it was

---

[10] Notes from the family decision meeting are not in the record.

early in the morning. Instead of using appropriate, positive, parenting techniques, mother yelled at the children from across the room and threatened to take things away from them if they did not behave. At no time, however, did Gomez feel that he had to intervene to keep the children safe.

On June 2, 2005, Rutter received a referral that father had "beat the hell" out of the children. Rutter subsequently interviewed K who told her that father had given her a "butt whipping" because she lied about misplacing a toy and blamed it on her brother. Rutter said K demonstrated by raising her right hand behind her head, as far as she could, and then bringing it down very quickly. K described being hit on the buttocks, lower back, and forearms or hands, and said she had been "popped" in the back of the head. K also told Rutter that she saw her father hit her brother T on the butt and then toss him onto the couch.

Rutter initially testified that she saw no evidence of physical injuries to K. In later testimony, she said that she had seen a very faint circular bruise on K's left buttock and testified that K had told her it was from her father hitting her with a belt. But, later still, she said that K had told her she could not recall how she got the bruise. Rutter also testified that K had told her that mother did not hit her but yelled instead and "would hit me but she knows you'll come take me away."

Rutter also attempted to interview K's brothers, T and J. T told Rutter that he had been "hit with a belt, smacked, spanked." When T was asked where he was hit, he indicated the back of his head, his legs, and also his buttocks. Rutter also testified that T had a "real faint" linear bruise above his left buttocks which he said came from his father hitting him with a belt. J had what might have been fingertip marks on the left side of his rib cage; however, Rutter was unsure if that was what they were. Rutter also discussed the referral with father. Father was cooperative and told Rutter that he thought a neighbor might have called DHS because the children had been upset and screaming one night.[11] He acknowledged spanking the two boys, but said that it was a last resort.

_____

[11] The neighbor was not, in fact, the source of the referral. That source is unnamed in the record.

While investigating the referral of father hitting the children, Rutter also learned that K's medication had been changed without DHS's knowledge. She testified, "[I]t wasn't that I'm opposed to medication being changed, I wanted to be aware that it was changed, what it was changed to, what the dosage was because that was one of our concerns when the kids came into care." She testified that there had been continuing problems with parents "not following through with the dosages or the type of medication or changing the medication." K told Rutter that she had been taken to Dr. Labuwi[12] soon after she returned home and that the medication had been changed because, in mother's opinion, her current medication, Adderall, was not working for her anymore. Rutter stated that she was concerned that K's doctor had not been made aware of all of the circumstances surrounding K's medication and that he had made his decision to change it based solely on mother's statements that it was not working. She also testified that K had experienced noticeable improvement on Adderall during the year she had been taking it while in foster care.[13] Rutter was concerned that Labuwi did not have this information when he prescribed the change.

Following a shelter care hearing, the children were again removed from parents' home and placed in protective custody. Shortly thereafter, the principal at K's school intercepted a note that K's cousin attempted to pass to her in school. The note was from mother and father and read,

"[K],

"We love you and are working on getting you back and your brothers. Hang in there sweetie. We'll see you Monday. Don't let them give you any medicine, ok.

"Give this note back to Dustin, don't let anyone else see it. We love you,

"Love Mom [and] Dad."

---

[12] Although Rutter testified that Warren, not Labuwi, was K's regular physician, she also acknowledged that K had been seeing Labuwi for four months, at the request of K's foster mother, with DHS's approval.

[13] Rutter also noted that K had eventually been taken off of the new medication because of its side-effects.

There was also a notation off to the side that said, "We don't want anyone getting in trouble, ok."

A permanency hearing was held on June 27, July 1, and July 8, 2005, at which time DHS requested the court to change the permanency plan for K from return to parent to adoption based on (1) parents changing K's medication without first notifying DHS; and (2) parents' use of physical discipline with the children contrary to DHS's rules. It argued that additional services would not benefit parents and allow the children to be returned home safely. DHS also noted that, because the children had been in foster care for 15 of the most recent 22 months, it had a statutory obligation to file a termination of parental rights petition. In Rutter's opinion, K was adoptable, although an adoptability study had not yet been completed at the time of the permanency hearing.

At the hearing, Rutter testified that, with the exception of updated psychological evaluations, she was not aware of any service that DHS could offer that had not already been offered to parents. She stated that DHS had exhausted "all of our resources on more than one occasion. [Parents have] done most of our services twice." She also indicated that the in-home services offered to parents were above and beyond the services that were normally provided to parents. Cooper, the parenting-class facilitator, stated that parents would not be successful candidates to take her program again because of their unwillingness to change. Ross testified that repeating her behavioral counseling with parents "at the level it was given" would not benefit parents. In her opinion, to become minimally adequate, the family would require full-time help in the home for several years. Specifically, mother would need to "really engage and be active and really follow through" in meeting the daily needs of her children. According to Ross, what the children needed was to be in a "safe and less chaotic environment."

Likewise, Gomez testified that parents would not benefit from his continued services, at least not at the level that he was able to offer them. In his opinion, to benefit from further services, parents would require a degree of support,

monitoring, and parental coaching that was beyond the ability of the child welfare system to provide. Even with monitoring and coaching five to ten hours a day, seven days a week for several weeks (assuming such services were available), he was not optimistic that parents would significantly improve and consistently use the skills that children "need to grow up healthy and strong." In his opinion, the children's needs for safety, security, attachment, and structure were not consistently being met by parents. When asked his long-term prognosis for the children if they were returned to the custody of parents without further interventions, he responded, "[A]n increase in reactivity on the part of all three children, difficulty [with] social skills, difficulty * * * in their ability to form a long lasting attachment to any adult care giver." He also expressed concern that parents' frustration would be likely to grow as the children's reactivity increased and that "that may lead to physical discipline that while legal in the state of Oregon would quickly devolve into physical abuse."

Mother and father both testified at the hearing. Mother first related K's medication history before she entered foster care. According to mother, K had initially been prescribed Ritalin, then switched to Adderall, then Depakote, then Tenex, and finally, Abilify, to treat her bipolar disorder. In each instance, K's medication had been changed because it was ineffective. K was taking Abilify when she went into foster care and, according to mother, doing "quite well." Soon after K returned home, mother discussed with K's teacher her concern that K's medication had been changed from Abilify back to Adderall while she was in foster care. She told the teacher that K had previously taken Adderall and that it "did not work for her." On May 2, mother took K to a previously scheduled appointment with Labuwi and expressed those concerns to him. Mother also told Labuwi that K had been doing well on Abilify before she was taken into custody. Labuwi then changed K's prescription back to Abilify.[14] Mother testified that she did not notify Rutter about K's appointment with Labuwi because it had been scheduled before K returned home and she assumed that Rutter was

[14] Labuwi did not testify at the permanency hearing, nor were any of K's medical records offered as evidence.

aware of it. Father was not present at the appointment with Labuwi, but was aware of mother's concerns.

Mother denied ever using physical discipline with the children after they were returned to parents' care. Mother stated that she used the disciplinary methods she had learned from the services that she had received through DHS, such as time outs or taking away privileges. She stated that she had implemented a "chore and rewards" system a few days before the children were removed and she felt that it was starting to be effective. She testified that she saw father "swat" one of the boys on one occasion after they came home, but, after she spoke to him about it and they agreed not to use physical discipline with the children, she never saw father use physical discipline again.

Mother further testified that, because she worked from 6:00 p.m. to 3:00 a.m. and was pregnant, she was often asleep when Gomez visited in the morning and he, in fact, only observed her parenting skills on three or four occasions. Mother reported that K kept to herself most of the time, although mother helped her with her homework and took her along on errands. Mother asserted that K was happy to be home and belonged with her parents. She also testified that, if the court decided to return K to her care, but not her husband's, she would accept that decision.

Father testified that he attended every session with the service providers, that he made copies of Gomez's notes after each meeting, and that he seriously attempted to implement the suggestions and techniques that he had been taught. He stated that the children needed to be disciplined frequently after they returned home, particularly T and J. However, according to father, K needed far less discipline than the other children and was generally just given timeouts or had privileges taken away when she did not do her homework. He also noted that she was bossy with the other children and attempted to mother them.

Father admitted to using physical discipline on three separate occasions since the children had been returned home. First, he testified that he had "popped" K on the bottom once when he caught her spanking T. He also testified to "popping" T on two occasions: once when T shoved J

down the stairs and another time after T hit K in the back of the head. In each instance, father said he used an open hand. He denied hitting any of the children with a belt or on their heads, arms, or legs. He also explained that he tried a progression of disciplinary methods as he had been taught and used physical discipline only as a last resort.

Father expressed concern that DHS did not allow the children and parents enough time to adjust to their new circumstances, especially considering their long separation. He felt that they were just beginning to make progress when the children were removed again. Father also testified that neither Ross nor Gomez ever indicated to him that he was not making satisfactory progress. To the contrary, he testified that Ross was "rather ecstatic that we were completing things that she wanted us to do in a timely manner."

Mother and father both testified that family counseling would be beneficial to help the family readjust to living together. They also suggested individual counseling for T to help him cope with the abuse that he had experienced while in foster care. In addition, father suggested parenting training targeted specifically toward parenting older children with attention deficit disorder and attention deficit hyperactivity disorder. In his opinion, the parenting class they were referred to did not adequately address the issues that they faced in parenting K. Father also reported that he was willing to undergo individual counseling for himself if his mental health diagnoses were confirmed by a second, independent psychological evaluation.[15]

At the conclusion of the hearing, the juvenile court found that neither parent had made sufficient progress toward meeting the "expectations set forth in the service agreement, letter of expectation and/or case plan." The court also found that DHS had made reasonable efforts to pursue the original plan of return to parents and the current plan of adoption. The court then ordered that the "current permanency plan is to achieve adoption." Mother and father appeal.

---

[15] The results of father's initial psychological evaluation were not made part of the record in this case.

■      Both parents contend that DHS failed to make reasonable efforts to make it possible for the children to remain in their care. Mother contends that parents were making sufficient progress, as evidenced by the children being returned home, and that the juvenile court erred in changing the permanency plan to adoption, at least as to her, because there is no evidence that K was harmed or at risk of harm while in her care. To support her argument, mother first asserts that there is no evidence that she ever used physical discipline with the children. Additionally, she confronted father after the one instance when she observed him "swatting" one of the children, and there is no indication that she knew of father using physical punishment after that point. With regard to K's medication, mother argues that she was only doing what she believed to be best for K, and, again, there is nothing to show that K was harmed by her actions. Finally, she argues that, because she was willing to care for K by herself, the court should have left K in her care, and ordered that father have no contact with her, instead of changing the permanency plan to adoption.

Father contends that the central issue is "whether the agency has exhausted its resources in the attempt to make it possible for the parents to resume care of [K]." He argues that there was no showing that his behavior resulted in any harm or risk of harm to K. He asserts that the evidence does not support any indication that K was physically abused and, in his view, the course of discipline he used with K, legal in Oregon, was "not inherently outside the bounds of normal discipline" or "a substantial departure from accepted guidelines of parenting" such that it would meet a statutory test for abuse or neglect or, as we understand his argument, support changing the permanency plan from reunification to adoption.

The state urges us to affirm the judgment of the juvenile court based on three circumstances: "1) mother's actions in obtaining a change in K's medication; 2) [the] use of physical discipline despite express instructions to the contrary; and 3) the chaotic conditions in the family home, and the parents' response to those conditions." The state contends that parents have not responded to DHS's reasonable efforts to reunify the family, "continue to make decisions that are

contrary to [K's] physical and mental health, and lack the ability to provide a stable and structured environment."

■     The parties agree that ORS 419B.476 governed the juvenile court's determination in this case. That statute provides, in part:

"(2)   At a permanency hearing the court shall:

"(a)   If the case plan at the time of the hearing is to reunify the family, determine whether the Department of Human Services has made reasonable efforts * * * to make it possible for the ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns."

Within 20 days of the permanency hearing, the court must enter an order including, among other things,

"[t]he court's determination of the permanency plan for the ward that includes whether and, if applicable, when:

"(A)   The ward will be returned to the parent;

"(B)   The ward will be placed for adoption, and a petition for termination of parental rights will be filed[.]"

ORS 419B.476(5)(b). Thus, to warrant a change in the permanency plan from reunification to adoption under the circumstances described in ORS 419B.476(2)(a), the court must find that, despite DHS's reasonable efforts to make it possible for the child to return home safely, a parent has not made sufficient progress to enable this to occur.[16] *See State ex rel Juv Dept. v. Williams*, 204 Or App 496, 130 P3d 801 (2006) (DHS is required to make reasonable efforts to make possible a child's safe return home before the permanency plan can be changed from reunification to adoption). We have previously explained that "[t]he type and sufficiency of efforts that the state is required to make and whether the types of actions it requires parents to make are reasonable depends on the particular circumstances." *Id.* at 506 (internal quotation marks

---

[16] ORS 419B.340(5) describes aggravated circumstances under which the court at a dispositional hearing may excuse DHS from making reasonable efforts, none of which are relevant here.

omitted); *see also State ex rel Juv. Dept. v. Gohranson*, 143 Or App 36, 47, 923 P2d 1259, *rev den*, 324 Or 395 (1996). We also consider whether a parent has attempted to make appropriate changes in his or her life, *State ex rel Juv. Dept. v. DeVore*, 108 Or App 426, 432-33, 816 P2d 647 (1991), and whether parents ignored or refused to participate in plans suggested by the state, *State ex rel Juv. Dept. v. Oseguera*, 96 Or App 520, 526-27, 773 P2d 775 (1989).[17]

■   In this case, the juvenile court, in an earlier permanency hearing judgment,[18] decided both questions in the affirmative—that is, that DHS had made reasonable efforts, and that parents had made sufficient progress, to enable K to return home and, in fact, she had been returned home. The question thus becomes whether parents' behavior after K returned home evidenced a lack of sufficient continuing progress to enable K to safely remain in the home so that DHS is relieved from the responsibility of providing further efforts to reunify the family. Our predominant consideration in making this determination is K's health and safety. ORS 419B.476(2)(a); *see also State ex rel Juv. Dept. v. Risland*, 183 Or App 293, 304, 51 P3d 697 (2002) (in determining whether reasonable efforts had been made at time of dispositional hearing, court was required to put child's health and safety first). Although we give considerable weight to the juvenile court's findings on issues of credibility, because our review is *de novo*, we must "independently assess and evaluate the evidence." *State ex rel SOSCF v. Frazier*, 152 Or App 568, 572, 955 P2d 272, *rev den*, 327 Or 305 (1998).

The gist of the state's argument is that parents' actions after K's return home, specifically, changing K's

---

[17] Although *DeVore* and *Oseguera* address "reasonable efforts" in the context of terminating parental rights, ORS 419B.498, the legislature's use of the same term throughout the juvenile code indicates that the term's meaning remains the same throughout. *See, e.g., PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993).

[18] A permanency hearing generally occurs 12 months after a finding of jurisdiction under ORS 419B.100 or 14 months after the child is placed in substitute care, whichever is earlier. ORS 419B.470(2). However, the court is also required to hold a permanency hearing at any time upon the request of DHS unless good cause otherwise is shown. ORS 419B.470(4). In this instance, DHS requested a permanency hearing to request a change in the permanency plan for K after the "12-month" permanency hearing had been held.

medication without notifying DHS, using physical discipline despite express instructions to the contrary, and maintaining "chaotic conditions" in the home, demonstrate parents' unwillingness or inability to adjust their circumstances to make it possible for K to safely remain at home, notwithstanding the extensive services provided by DHS.

We begin with the issue of K's medication. Mother's contention that she was never instructed not to change K's medication without first notifying DHS is not credible. Although the notes from the family decision meeting preceding K's return home are not part of the record, DHS presented credible testimony that mother was instructed, on more than one occasion, to notify DHS before changing K's medication. Indeed, given the fact that K's medication was a matter of such serious contention between mother and DHS, it is not surprising that DHS stressed that point with parents. In addition, mother herself testified that the only reason that she did not inform DHS of the appointment with K's doctor is because she presumed that DHS already knew of it, thus evidencing an awareness on her part that she was under some obligation to notify DHS of K's medical issues.

Despite those instructions, mother sought to have K's medication changed without first notifying DHS. Given the mandate of ORS 419B.476(2)(a), however, the question before us is not whether mother failed to follow DHS's instructions but whether, in doing so, she put K's health and safety at risk. We conclude that she did not. Mother expressed her concerns to K's physician who, in turn, changed K's prescription; mother did not change K's medication on her own, nor is there any evidence that she stopped giving K the previously prescribed medication before the change. Moreover, mother did not surreptitiously take K to an unfamiliar doctor. Instead, she used the occasion of a previously scheduled appointment, with a doctor who had cared for K for the past several months with DHS's approval, to express her concerns. Finally, DHS argues that parents' failure to notify them resulted in Labuwi changing K's medication solely on the basis of mother's concerns, which, in DHS's opinion, was a mistake. However, DHS did not present any evidence to support that assertion and, without evidence to the contrary, we presume that Labuwi's decision was based

on sound medical experience and knowledge. In sum, mother sought the advice of K's treating physician and relied on his decision as to what medication was best for K. We do not see how those actions show mother's lack of progress in providing a safe home for K.

Parents' later note to K to not "let them give you any medicine," while a cause for concern, does not persuade us otherwise. Mother concedes that the note reflected poor judgment, and we agree. However, there is no evidence to indicate that mother would, on her own, refuse to give K medication that had been prescribed by her physician. Instead, as noted above, when she had concerns about K's medication, she took those concerns to K's doctor and abided by his decision. Thus, the note, without more, does not support a conclusion that K's health and safety would be in jeopardy if placed in parents' care.

We turn to the question of parents' use of physical discipline with the children, despite DHS's instructions to the contrary. DHS makes much of the fact that physical punishment is prohibited under OAR 413-200-0347(2)(a) for children in that agency's legal custody. Father, in turn, asserts that the use of physical discipline is allowed under Oregon law. However, our determination of whether a change in the permanency plan is warranted does not turn solely on the legality of a parent's conduct, but, rather, on whether that conduct reflects insufficient progress on the part of the parent to permit the child's safe return home.

We begin by emphasizing that DHS did not assert on appeal that parents' conduct amounted to physical abuse of K.[19] Nor do they argue that parents' physical discipline of the other children placed K at risk of harm. Rather, DHS's argument is that, despite specific instruction that physical discipline was prohibited; advice and training from service providers that physical discipline was ineffective and inappropriate in dealing with their children; and extensive training in alternative forms of discipline and positive parenting

---

[19] Nor does the evidence support such an assertion as it relates to K.

techniques, parents still found it necessary to resort to physical punishment, thereby demonstrating questionable parenting judgment and an inability to assimilate positive parenting skills.

We readily dispose of that argument as it relates to mother. The record is devoid of any evidence that mother used physical discipline with the children, or that she failed to protect them from such discipline by father. The one time she witnessed father spanking one of the children, she obtained his agreement that he would not do it again, and there is no evidence to indicate that she knew that father had violated that agreement. We disagree with DHS that mother "minimized" father's use of physical discipline or that she herself had failed to learn parenting techniques that would make its use "superfluous." The record simply does not support those assertions.

Father's disregard of DHS's instructions regarding the use of physical discipline, on the other hand, is disturbing. However, on the record before us, we are not convinced that it provides a sufficient basis for concluding that there is no further purpose in attempting to reunite K with parents and, therefore, for changing the permanency plan to adoption. Father admitted spanking K on one occasion, using an open hand. There is no evidence that K was injured by father's conduct or that she was subject to risk of future injury.[20] Father expressed regret for having resorted to physical discipline, was able to articulate the dangers of using physical punishment with his children, and described a progression of alternative disciplinary techniques, such as time outs and taking away privileges, that he generally used with them. On this record, father's failure to adhere to DHS's regulations does not warrant changing the permanency plan for K to one of adoption.

The final ground on which DHS relies to support a change in the permanency plan is parents' alleged chaotic home environment. Again, on this record, we are not persuaded that the home environment demonstrates parents'

---

[20] Rutter testified that she observed a faint bruise on K, but the state did not establish that it had been caused by father.

unwillingness or inability to change their circumstances such that K cannot be safely returned home. The evidence showed that K spent most of her time in her bedroom doing homework, that she was bossy and tried to mother her younger siblings, and that, at times, mother asked her to go upstairs to check on her brothers. DHS did not establish that the chaotic home environment jeopardized K's health or safety. To be sure, Ross observed the younger children "running around upstairs" and parents "yelling" at them from a distance. Gomez also testified that parents had difficulty keeping up with the children after they were returned home and that the children appeared anxious and overactive. Notably, however, Gomez never found it necessary to intervene for the safety of the children. And Ross, while understandably concerned about the younger children running around upstairs unsupervised, also did not point to any specific danger to K.

Moreover, parents did not ignore or refuse to participate in plans suggested by the state. Ross testified that she saw father using a parenting technique for trying to calm T that she had suggested earlier. Father made photocopies of the notes that Gomez took during visits and attempted to implement his suggestions in future sessions. Mother testified that she had discovered a system of discipline that was just beginning to work when the children were removed from the home. We agree with DHS that parents have failed to demonstrate a proficiency in applying the positive parenting skills that they had been taught. However, it is not unrealistic to expect that they will be able to do so within a reasonable period of time, given the opportunity. As noted above, whether "the types of actions [DHS] requires parents to make are reasonable depends on the particular circumstances." *Williams*, 204 Or App at 506. In the absence of any risk of harm to K, we conclude that it was unreasonable for DHS to expect parents to master, in a five-week period, the parenting techniques they had learned in DHS training.

DHS contends that it has made reasonable efforts to reunite the family and that providing additional services to parents would be fruitless. According to DHS, during the lengthy time that K has been in foster care, "there [has] been no significant improvement in her parents' ability to provide a minimally adequate home situation for her." We disagree.

Rutter herself testified that parents were in compliance with everything DHS asked of them before K was returned home. Both Ross and Gomez provided concrete examples of improvements parents had made in improving their parenting skills. In addition, there is no indication in the record that parents were ever told by Gomez or Ross that they were not meeting DHS's expectations during that time. Indeed, Gomez's and Ross's testimony at the time of the permanency hearing, just weeks after their recommendation that the children be returned home, that parents would require long-term in-home assistance was unconvincing. When pressed for specifics, Ross opined only that mother would need to "really engage and be active and really follow through" in meeting the daily needs of her children. In her opinion, the children's daily needs were to be in a safe and less chaotic environment.

We share DHS's, and the juvenile court's, concern about the length of time K has been in foster care.[21] However, the record indicates that, with the exception of the parenting classes, most of the services provided to parents took place in the four months immediately preceding the permanency hearing. Additionally, both service providers had limited opportunity to work with the family after K returned home: Ross had three visits during that time; Gomez only two where K was actually present. Expecting parents to consistently apply and perfect newly learned parenting skills within a few weeks of the return of three young children to their home is unrealistic. Parents' failure to do so may fall short of what would be expected of model parents, but that is not the standard. Rather, the question is whether parents' default in that regard put K's health and safety at risk, ORS 419B.476(2)(a), and we conclude that it did not. Thus, parents should be afforded further opportunity to demonstrate

---

[21] ORS 419B.498 provides that DHS must file a petition to terminate the parental rights of a parent if the child has been in substitute care under the responsibility of DHS for 15 of the most recent 22 months unless, among other exceptions, there is a compelling reason, documented in the case plan, for determining that filing a petition would not be in the best interests of the child. One such compelling reason identified by the legislature is that the parent is "successfully participating in services that will make it possible for the child or ward to safely return home within a reasonable time." Another is that the court or local citizen review board previously "determined that while the case plan was to reunify the family the department did not make reasonable efforts * * * to make it possible for the child or ward to safely return home[.]" ORS 419B.498(2)(b).

their ability to adjust their conduct and become minimally adequate parents to K. Beyond that, we hesitate to delineate exactly what types of additional efforts would be reasonable for DHS to undertake. Nonetheless, we note that parents' suggestion of family counseling does not appear to be unreasonable, given the family's long separation.

In sum, we conclude that parents have made sufficient progress toward making it possible for K to safely return home and that further efforts are warranted to make it possible for K to return home. Accordingly, the juvenile court erred in changing the permanency plan for K from reunification to adoption at this time.

Reversed.