Submitted August 13, reversed and remanded November 26, 2014

In the Matter of T. S.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*
*and*

T. S.,
*Respondent,*

*v.*

T. S.,
*Appellant.*

Multnomah County Circuit Court
2011813482;
Petition Number 109037M;
A156255

340 P3d 142

Caitlin Mitchell filed the brief for appellant.

Ginger Fitch filed the brief for respondent child.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Judy C. Lucas, Senior Assistant Attorney General, filed the brief for respondent Department of Human Services.

Before Garrett, Presiding Judge, and Ortega, Judge, and DeVore, Judge.

GARRETT, P. J.

Ortega, P. J., concurring.

### GARRETT, P. J.

In this juvenile dependency case, father appeals the juvenile court's permanency judgment changing the plan for his daughter, T, from reunification to adoption. Father assigns error to the juvenile court's determination that the Department of Human Services (DHS or the department) made reasonable efforts to reunify father with T. We agree with father and conclude that DHS's efforts were not reasonable. Accordingly, we reverse and remand.

T was born on December 31, 2010. The department first became involved nine months later, in September 2011, when it received reports of father's violent behavior against T's mother in T's presence. At that time, T lived with mother. DHS spent the next two months attempting to locate and speak with mother about the reports. DHS had no address or telephone number to locate father, who was later determined to be living in Newport. In December 2011, DHS filed for protective custody over T. T was placed in relative foster care with mother's maternal aunt in Burns. DHS reached father for the first time later in December. Father said that he had recently been released from jail, that he had a methamphetamine addiction, and that he was "open" to entering drug treatment and working with DHS. He also admitted that he and mother were "neglectful" to T, that they were "constantly arguing," and that they exposed T to "horrible living conditions." DHS then filed a petition to establish dependency, based on mother's drug use and exposure of T to "unsafe people," and on father's drug use and domestic violence against mother.

In February 2012, father contacted DHS again, told the department that he wanted to start services, and was instructed to call back with his address, as he could not recite it when asked. Father never called back; DHS discovered that his telephone had been disconnected. The next month, father called DHS again, provided his address, and again expressed interest in participating in services, but he did not call back to follow up. DHS also noted that father had "had several recent police contacts" and had an outstanding warrant for his arrest stemming from his domestic abuse of mother.

Father also made his first appearance before the juvenile court in this case at a review hearing, where he informed the court that he would like to have contact with T. In April 2012, the juvenile court made findings of jurisdiction as to father, and father admitted to the allegations in the dependency petition that his drug abuse impaired his judgment and ability to safely and appropriately care for T.[1] At that same hearing, the court ordered father to complete a drug and alcohol evaluation, participate in random urinalysis (UA) testing, enroll in parenting classes, obtain stable and suitable housing, maintain regular visitation with T as arranged by DHS, maintain contact with DHS and keep the department informed of "current contact information" at all times, clear all warrants and pending criminal matters, and sign releases of information for DHS for all services.

In June 2012, father was arrested for possession of methamphetamine. DHS reached father while he was in custody at the Lincoln County Jail, at which time father told the department that he was again "ready to engage in services." While at the jail, father wrote a letter to mother, and mother sent photos of T to father. Later that month, father was released to the Salvation Army Treatment Center in Portland for drug and alcohol treatment, as well as anger management and parenting classes. Initially, father was "doing well" and DHS "hoped that he [would] continue in this service." That appears to be the last contact that DHS had with father for approximately one year.

In July 2012, father failed to appear for a dependency review hearing concerning the allegations against him in the dependency petition. At that hearing, the court took testimony from DHS caseworker Sams, and based on Sams's testimony, found that father had subjected T's mother to domestic violence. The court entered a judgment establishing dependency and ordered father, among other things, to enroll in a batterer's intervention program and to comply with all terms of probation, parole, or post-prison supervision. Father was only in treatment for "a short time" before he left the Salvation Army without completing his treatment and went back to Newport.

---

[1] The allegations regarding father's domestic violence against mother were held in abeyance.

In a DHS report from November 2012, DHS noted that father, upon leaving treatment early, had a warrant out for his arrest, and although he had started parenting and anger management classes while in the treatment center, he had not "engaged in any services since he left." Meanwhile, mother had been progressing well enough in her own treatment that T was returned to her care. After T was returned to mother's care, DHS noted in a report that it had been in contact with both maternal and paternal relatives for case-planning purposes and sibling visits. The juvenile court held a permanency hearing in December 2012, where it learned that father had been recently arrested and was in custody at Lincoln County Jail.[2] The case plan remained to reunify the family.

T was again removed from her mother's care and again placed with her aunt in September 2013, because, at the time, mother was "essentially homeless" and was "unable to meet the needs" of the child.

A second permanency hearing was held on December 3, 2013, about one year after the first was held, before a juvenile court referee. By this time, father had been incarcerated for nearly one year, first at the Lincoln County Jail and then, beginning in May 2013, at the Snake River Correctional Institution. Through his attorney, father argued that the department had ignored father's repeated requests during that time to have contact with T:

> "[T]hroughout the time that he's been incarcerated, [we have] been trying to get visitation—or, sorry, phone contact or other kinds of contact, and it's only after—it's only in the past month when, frankly, I've been emailing [Sams] and calling him a lot, that this stuff with the letters and the updates have actually happened for the first time in an entire year, and so I would argue that that amount of progress, although commendable, doesn't constitute reasonable efforts[.]"

Evidence was presented that, at father's attorney's request, DHS had finally contacted father in prison in July 2013, and that some discussion about the possibility of visits with T and father occurred during August and September 2013.

---

[2] The record is silent as to the nature of father's arrest.

DHS explained to the referee that it had made extensive efforts toward mother during the dependency case, including housing assistance, visitation with T when T was not in mother's care, domestic violence treatment, and drug and alcohol counseling. DHS noted that mother had had mixed results with her services, and, at the time of the hearing, was at risk of being kicked out of a treatment program for failing to attend. DHS asked for an extension of time for 60 days in the hope that mother could make sufficient progress so that T could again be returned to her.[3] T's attorney opposed any further continuance on the grounds that T had already "suffered ill effects of chaotic living environments" and needed "stability and permanency."

The referee denied DHS's request for an extension and changed T's permanency plan from reunification to adoption at the close of the hearing, based on the court's conclusion that the department had made reasonable efforts to reunify the family[4] and that there was no evidence that T would be able to reunify with either parent "in the very near future or in a period of time that comports with the developmental stages of [T] and her needs." The court also ordered psychological evaluations of mother and father.

Sometime after the permanency hearing, both mother and father requested a rehearing before a judge. At the December 30, 2013, rehearing, the court heard additional testimony about father's progress and the department's efforts toward father during the previous year. Father testified that he sought out on hi sown volition, parenting classes that would start soon, and he was already

---

[3] DHS case notes from the week prior to the December 2013 permanency hearing reflect that the department sought an extension of time before the permanency hearing occurred to allow mother to "be further along in her domestic violence class and to try and find housing so that DHS can get to a point of returning [T] back to her care." The record also notes that initially, DHS aimed to seek a 90-day extension.

[4] In its order, the court, using a check-the-box form, found that DHS had made "reasonable efforts to reunify the family during the period since the last review/permanency hearing" (on September 25, 2013) and that those efforts, regarding father, included: "alcohol & drug evaluation or treatment"; "UA or other drug testing"; "domestic violence batterer intervention program"; "parent training"; and "supervised visitation with child." As father points out on appeal, however, the record does not reflect that all of those services had been provided "since the last review/permanency hearing."

participating in AA/NA groups and drug awareness classes. He also testified that he was employed at the prison, was working towards his GED, was attending chapel services, and was meeting regularly with his prison counselor. Father also described his efforts to correspond and keep updated on T:

> "I sent [T] cards and then I sent [Sams] letters specifically from me asking [Sams] for a phone call to see if I can have phone contact with [T] or about visits or updates from [Sams]. There was no response from those letters, but I know that the cards made it to [T] so [Sams] obviously received the letters."

Father also testified that he had recently received permission to send his letters directly to T, and that the child's aunt had provided him with at least two updates and photos of T. Father also described plans to enroll in domestic violence classes upon his release in Lincoln City and said that he would live with his current girlfriend in stable housing "five minutes" away from the classes. His release from prison was scheduled for June 4, 2014, approximately five months from the date of the rehearing.

Caseworker Sams testified that DHS had decided against developing the relationship between father and T, explaining that

> "[mother] had—well, [mother] had physical custody of the child from back in December of 2012 all the way up to September [2013], and we had talked and it—we had come to the *** conclusion that since [mother] was—had the child and that [mother] and [father] were likely not going to get back together or have a good relationship, it would probably be another loss for [T] so we decided that at that time it would probably be in the best interest of the child to not have—you know, what would be the point to introduce her to [father] when the relationship wouldn't be continuing on when the case was dismissed when the child was with [mother]."

In answer to the court's inquiry as to father's relationship with T prior to his incarceration, Sams replied that he did not believe "there was much of one." Father testified that he had helped care for T for the first eight months of her life.

In January 2014, the juvenile court affirmed the referee's order. The court made additional findings of fact as to father, including that father was "doing all the services that he [could] do under the circumstances and he has, since June 2012, been persistent about being in contact with [T] to the greatest extent possible." The court also noted that when father was not incarcerated, "he did nothing" to seek the services that would facilitate reunification with T. It also observed that father was not set to be released from prison until June:

> "Perhaps jail has made [father] think hard about his obligations as a parent. Perhaps jail simply prevents him from engaging in the lifestyle that is so dangerous for [T] * * * [E]ven assuming this time will be different from the last time he was released, at that point he will just be starting services that take time to be absorbed and to demonstrate effectiveness. It does not appear from the record that he has spent any significant time with the child before his incarceration. Any reunification would necessarily be gradual. This child has been waiting two years. How much longer should she be asked to wait? * * * [T] would remain in foster care for another year, after two years already being a ward of the state. Perhaps if she were an older child, this might be acceptable. But if she is to have any success in being adopted, that needs to occur sooner, not later."

The court concluded that DHS had made reasonable efforts to reunify father with T "both before this current incarceration and since." Father now appeals the juvenile court's permanency judgment and assigns error to the court's finding that DHS's reunification efforts were reasonable.

Father requests *de novo* review, pursuant to ORS 19.415(3)(b). We exercise that discretion sparingly and only in exceptional cases. *State v. S. N. R.*, 260 Or App 728, 733, 320 P3d 569 (2014); ORAP 5.40(8)(c). We do not view this as an exceptional case, and we decline to exercise *de novo* review. Accordingly, we "view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the [juvenile] court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013).

Father contends that the trial court erred when it determined that DHS had made reasonable efforts at reunification, "both before this current incarceration and since," as required by ORS 419B.476(2)(a).[5]

"The type and sufficiency of efforts that the state is required to make and whether the types of actions it requires parents to make are reasonable depends on the particular circumstances." *State ex rel Juv. Dept. v. Williams*, 204 Or App 496, 506, 130 P3d 801 (2006) (citing *State ex rel SOSCF v. Frazier*, 152 Or App 568, 582, 955 P2d 272, *rev den*, 327 Or 305 (1998)) (internal quotation marks omitted). In making a reasonable efforts determination, a court "must consider not only the burdens that the state would shoulder in providing those services, but also what benefit might reasonably be expected to flow from them." *Dept. of Human Services v. M. K.*, 257 Or App 409, 416, 306 P3d 763 (2013); *see also Dept. of Human Services v. T. R.*, 251 Or App 6, 13, 282 P3d 969, *rev den*, 352 Or 564 (2012) ("The particular circumstances of each case dictate the type and sufficiency of efforts that the state is required to make and whether the types of actions it has required parents to take are reasonable."). Whether DHS has provided appropriate services and reasonable efforts should be evaluated "in view of the nature of the parent's problems." *Dept. of Human Services v. D. L. H.*, 251 Or App 787, 802, 284 P3d 1233 (2012), *rev den*, 353 Or 445 (2013).

We have made it clear that the mere fact of a parent's incarceration may not "serve as a basis for excusing DHS from making reasonable efforts toward reunifying the family." *Williams*, 204 Or App at 506; *see also D. L. H.*, 251

---

[5] Father, on appeal, suggests that we should limit our consideration of the department's efforts to "the review period at issue," which, he contends, is the time between September 25, 2013 (the last review hearing, where the court found that DHS was making reasonable efforts) and December 3, 2013 (the permanency hearing, where the court again found that DHS was making reasonable efforts). DHS responds that we must consider "all of DHS's efforts during the life of the case." Father cites no authority for the proposition that our assessment of the department's efforts should be so constrained, which is at odds with our case law, as well as the guiding principle that "reasonable efforts" are to be evaluated under a "totality of the circumstances." *M. K.*, 257 Or App at 411; *State ex rel Juv. Dept. v. J. L. M.*, 220 Or App 93, 123-24, 184 P3d 1203 (2008) (viewing DHS's efforts "over the life of this case," which spanned several years, including periods before and after a parent's incarceration).

Or App at 799 ("In a case involving an incarcerated parent, although the type of services available to the parent may be limited, DHS is not excused from making the requisite efforts because of the parent's incarcerated status.").

We also consider whether a parent has attempted to make appropriate changes and whether he or she ignored or refused to participate in plans as required by DHS. *State ex rel Dept. of Human Services v. H. S. C.,* 218 Or App 415, 423, 180 P3d 39 (2008); *State ex rel Juv. Dept. v. DeVore,* 108 Or App 426, 432-33, 816 P2d 647 (1991). "[W]hen a parent is unable to benefit from services or has demonstrated an unwillingness to participate in programs, DHS may reasonably stop providing those services, or decide not to provide others." *M. K.,* 257 Or App at 416-17.

We have held that DHS must make reasonable efforts towards both parents in a case, even when one parent is more accessible than another. *See Dept. of Human Services v. J. F. D.,* 255 Or App 742, 750, 298 P3d 653 (2013). For example, in *J. F. D.,* the father lived in Kentucky, while mother and child lived in Oregon. DHS argued that it was not required to make reasonable efforts "specifically as to father," because its efforts should be viewed under the totality of the circumstances, including its extensive efforts on behalf of the mother. *Id.* at 748. In rejecting that argument, we held that "in determining the reasonableness of DHS's efforts *** the juvenile court must assess DHS's efforts as to *each* parent." *Id.* at 750 (emphasis added).

We have also held that DHS's efforts were not reasonable when the department's efforts towards an incarcerated parent were "virtually nonexistent." *Williams,* 204 Or App at 507. For example, in *Williams,* the father was incarcerated for approximately 16 months during ongoing juvenile proceedings involving his child. While incarcerated, the father participated in "all the programs offered at the jail," which included substance abuse and addiction support meetings, as well as parenting classes. *Id.* at 499. The father was unable to contact DHS from prison but made repeated requests, through his attorney, that DHS contact him. Even still, "DHS appear[ed] to have communicated with father only twice *** [and] those two communications

merely instructed father to contact DHS on his release." *Id.* at 507. DHS's reports to the juvenile court made nearly no mention of the father, except to "list 'face-to-face contacts' that appear[ed] to allude only to hearings in the case and to note that DHS had not contacted father and that father had not contacted the agency." *Id.* We concluded, in light of father's "relatively short incarceration, the lack of any information about his relationship with child, and his apparently imminent release from jail within four months of the permanency hearing," that DHS had failed to make reasonable efforts. *Id.*

By contrast, in *D. L. H.*, we held that DHS made reasonable efforts to reunify an incarcerated mother with her two children, even though DHS neither arranged for visitation with the children where mother was incarcerated, nor offered treatment services to her. 251 Or App at 801. In that case, a DHS caseworker visited the mother in prison and offered her a substance abuse evaluation, which she refused; DHS called the mother on the telephone in prison; DHS communicated with the mother's prison counselor about what services were available to her while she was incarcerated; and DHS evaluated whether it would be appropriate for her children to visit their mother while she was incarcerated. *Id.* at 801-02. We noted that the mother could not "complain" that DHS had not made reasonable efforts when she had been offered a drug and alcohol treatment evaluation and "refused to participate." *Id.* at 802; *see also J. L. M.*, 220 Or App at 123-24 ("Although father may have legitimate complaints about not being offered services while in prison or being offered services slowly, those complaints do not change our analysis because father failed to engage in those services when they were offered. Although DHS could have made greater efforts to provide services while father was in prison, its efforts over the life of this case, including the period after father's release from prison, were reasonable.").

With that framework in mind, we return to the circumstances of this case. Here, father contends that DHS failed to make reasonable efforts because, despite father's efforts to make contact with T, the department did not contact him at all for a period of approximately

one year (from June or July 2012 through July 2013), did not look into arranging visitation or telephone calls with T until father had been incarcerated for seven or eight months, and made no efforts to assist father in developing his relationship with T other than forwarding his letters to her. We agree with father that DHS's efforts were not reasonable.

The record indicates that, since this case was opened in September 2011, DHS worked extensively with mother but seldom turned any concerted attention towards father, despite father's repeated requests for assistance in the year or more prior to the December 2013 permanency hearing. DHS did offer to help father access services early on, and father's response (unsurprisingly, in light of his addiction to methamphetamine) was erratic. Despite stating an interest in receiving services, father failed to follow through with DHS and left the Salvation Army treatment center in July 2012 after a short stay.

Father was incarcerated again beginning in December 2012, and that period was marked by a noticeable change in his behavior. Without assistance or encouragement from DHS, father took the initiative to seek out parenting classes at the prison, attended AA/NA meetings and drug awareness classes, was employed in prison, attended church services, met regularly with his counselor, and was working toward his GED. The record reflects that father repeatedly asked DHS to assist with telephonic or in-person visits with T after he was incarcerated in December 2012. The juvenile court also expressly found that father had been "persistent" about trying to contact T since as early as June 2012.

Yet there is no evidence of any effort by the department to contact father from July 2012 until July 2013, when father's attorney asked that DHS telephone father in prison. It appears, in light of Sams's testimony, that DHS chose to focus solely on mother because she was regarded as being a more viable candidate for reunification. That was impermissible. *See J. F. D.*, 255 Or App at 749-50. By the time of the December 2013 permanency hearing, DHS was doing

more to help father exchange cards and photos with T. But that happened only after T was removed once again from mother's care in September 2013—nine months after father was first incarcerated.

In short, the period from the commencement of this case through the December 2013 permanency hearing was a little more than two years. For roughly half of that time, DHS essentially ignored father based on an apparent rationale that T was more likely to reunify with mother and that father and mother would never reunite. The department followed that course at the very same time that father was making concerted efforts to address his addiction and repeatedly requesting DHS's assistance in meeting with or talking to T. Viewing the circumstances of this case in their totality, DHS did not make reasonable efforts to reunify father with T.

Reversed and remanded.

**ORTEGA, J.,** concurring.

I concur in the result because I agree with the majority's determination that DHS failed to make reasonable efforts to reunify father with T. However, I write separately to express my disagreement with the majority's analysis.

Today we also decide a different case, *Dept. of Human Services v. S. W.*, 267 Or App 277, 340 P3d 675 (2014), in which the majority concludes under very similar circumstances that DHS made reasonable efforts to reunite the father with his daughter. In both cases, the majority frames the inquiry in terms of the father's behavior, justifying doing so on the theory that the determination of what efforts are reasonable must be made in light of "whether a parent has attempted to make appropriate changes in his or her life * * * and whether parents ignored or refused to participate in plans suggested by the state," *State ex rel Dept. of Human Services v. Shugars*, 208 Or App 694, 712, 145 P3d 354 (2006), and should reflect consideration of "what benefit might reasonably be expected to flow from" efforts extended by DHS, *Dept. of Human Services v. M. K.*, 257 Or App 409,

416, 306 P3d 763 (2013). *See S. W.*, 267 Or App at 286; *T. S.*, 267 Or App at 309.

Although I agree with the result in this case, I believe that the majority's analysis places too great an emphasis on the parent's behavior. Indeed, a comparison of the two cases illustrates the point. In both cases, the fathers participated in services inconsistently early in the case. In both cases, DHS made some efforts early on to connect the father to services and to arrange for contact with the child at issue. In both cases, DHS was primarily working with the child's mother, and those efforts ultimately failed. And in both cases, the fathers were incarcerated and DHS discontinued services and had little to no contact with the father for an extended period of time. Indeed, in *S. W.*, the period of time in which DHS ceased to provide services was 33 months, significantly longer than in this case.

What appears to make the difference to the majority in this case is that father took more initiative to seek out more services while in prison and to write to his child than did the father in *S. W.* and that father persistently asked DHS to assist with telephonic and in-person visits with T. 267 Or App at 312. By contrast, the majority faults the father in *S. W.* with making only a single request for telephone visits with his daughter and for writing letters only after being encouraged to do so and for not choosing the right services to participate in while in prison. *S. W.*, 267 Or App at 284, 293-94.

The majority's focus on whether the parent has taken sufficient initiative in the absence of efforts by DHS is misplaced and, taken to its logical conclusion, would allow DHS to hedge its bets on providing reasonable efforts to many parents who lack the coping skills to advocate for themselves and to devise an appropriate reunification strategy without DHS's statutorily required reasonable efforts. Given that the court takes jurisdiction only in cases where parents are functioning in a manner that presents a risk of harm to the child, ORS 419B.090(2)(a)-(b); ORS 419B.150(a); ORS 419B.157, many such parents will lack the skills to take sufficient initiative to meet the standard the majority applies. Yet, when DHS applies reasonable efforts

to assist a parent with devising and executing a plan, as it is statutorily required to do, some unpredictable number of parents—including incarcerated parents—step up participation as their case proceeds. The statute does not condition DHS's obligations on parental compliance or initiative and, indeed, doing so would be contrary to the statutory scheme, which calls for the state to do what it reasonably can to ensure that parental rights are preserved where a parent can be brought up to the standard of minimal adequacy. *State ex rel Juv. Dept. v. Williams*, 204 Or App 496, 500, 130 P3d 801 (2006); *State ex rel SOSCF v. Frazier*, 152 Or App 568, 582, 955 P2d 272, *rev den*, 327 Or 305 (1998).

I agree with the result in this case because DHS failed to contact father for a period of approximately one year, did not look into arranging visitation or telephone calls with T until father had been incarcerated for nine months, and made no efforts to assist father in developing his relationship with T other than forwarding his letters to her. The efforts that father made on his own do not factor into my analysis of whether it was unreasonable for DHS to focus its efforts on mother, whom it regarded as a more viable candidate for reunification.

For those reasons, I concur in the result reached by the majority.