Argued and submitted January 6, reversed and remanded June 8, 2016

In the Matter of M. S.,
a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

S. S.,
*Appellant.*

Multnomah County Circuit Court
2013805582;
Petition Number 110124M;

In the Matter of J. S.,
a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

S. S.,
*Appellant.*

Multnomah County Circuit Court
2013805583;
Petition Number 110124M;
A160077

375 P3d 556

Christa Obold Eshleman argued the cause and filed the brief for appellant.

Judy C. Lucas, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Paul L. Smith, Deputy Solicitor General.

Before Sercombe, Presiding Judge, and Tookey, Judge, and DeHoog, Judge.

**TOOKEY, J.**

In this juvenile dependency case, mother appeals a judgment of the juvenile court that changed the permanency plan for two of her children from reunification with a parent to adoption.[1] Mother contends, among other things, that the juvenile court erred in changing the plan to adoption without considering the reasonableness of the efforts that the Department of Human Services (DHS) made to reunite the children with her over the whole life of the case. We agree with mother that the court erred in considering only the most recent few months of reunification efforts by DHS as the basis for its determination that "[DHS] has made reasonable efforts * * * to make it possible for the ward to safely return home and * * * the parent has [not] made sufficient progress to make it possible for the ward to safely return home." ORS 419B.476(2)(a). We also agree with mother that, under these circumstances, the juvenile court could not determine that DHS's efforts were reasonable. Accordingly, we reverse the permanency judgment.

Where, as here, no one has asked us to review the facts *de novo* and we do not do so, we "(1) assume the correctness of the juvenile court's explicit findings of historical fact if these findings are supported by any evidence in the record," and "(2) further assume that, if the juvenile court did not explicitly resolve a disputed issue of material fact and it could have reached the disposition that it reached only if it resolved that issue in one way, the court implicitly resolved the issue consistently with that disposition." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639-40, 307 P3d 444 (2013). Ultimately, "we assess whether the combination of (1) and (2), along with nonspeculative inferences, was legally sufficient to permit the trial court to determine" that the relevant legal standard—here, whether DHS made reasonable efforts to reunify the family—was met. *Id.*

This appeal concerns mother's two youngest children, M and J, who were almost five and almost four years old, respectively, at the time of the rehearing that led to the judgment on appeal. On rehearing, the juvenile court

---

[1] The children's father has not participated in this case and is not a party on appeal.

affirmed the referee's decision to change the permanency plan for M and J to adoption. C, mother's oldest child, was 12 years old at that time. The permanency plan for him was, and remains, guardianship with his paternal grandmother.[2]

C, M, and J lived with mother until July 2013. After mother was attacked by gang members who were friends of father, mother tested positive for cocaine, and DHS learned that mother had recently left the children with her grandmother, who mother admitted was not a safe caregiver, DHS took the children into protective custody. DHS filed a petition alleging that the children were within the jurisdiction of the juvenile court on a variety of grounds.

C was placed with his paternal grandmother, with whom, as noted above, he remains. M and J were placed together in a nonrelative foster placement that later became their adoptive placement. DHS scheduled visits between mother and the children during July and August 2013, and mother attended three of six visits. The last time she visited M and J was on August 15, 2013.

By September 2013, mother had been arrested and jailed in Clatsop County on charges including attempted murder and numerous counts of identity theft. She admitted to a jurisdictional allegation that she "is incarcerated for an unknown period of time, and is therefore unable to be a custodial resource for the children." In October 2013, the juvenile court entered a judgment taking jurisdiction over the children based on mother's admission and the fact that father failed to appear at the jurisdictional hearing.

When M and J were placed in foster care, they were approximately three and two years old, respectively. They both had extraordinary behavioral difficulties, including angry outbursts, issues regarding food, and extreme difficulty going to sleep at night. M's problems included tantrums that were made worse when the foster parents tried to comfort her; she would bang her head against the wall, pull her hair, and throw herself down, even on concrete.

---

[2] C has a different father from M and J, mother's two youngest children, so his paternal grandmother is not a biological relative of M or J. When we refer to "father" in this opinion, we mean the father of M and J.

M had disproportionately severe responses to stressors, including sirens and other loud noises. At the permanency hearing that led to this appeal, M's therapist testified that her behaviors could be related to early childhood traumas and lack of secure attachment in the early years of her life; the trauma of removal from her family could also be a cause.

While mother was incarcerated in the Clatsop County Jail, DHS decided that visits with mother would not be appropriate for M or J. Mother began writing letters to M and J, and, the DHS caseworker assigned to the case, Todd, believed that the content of the letters was appropriate for the children. However, Todd decided in December 2013, in consultation with the foster mother, that "it may be inappropriate to bring up the letters with the children due to their age." Todd also did not tell the children where their mother was because the children were not talking yet.

In January 2014, the foster parents found a therapist, Kubin, who was able to establish a good relationship with M and help her make progress toward having less anxiety. Kubin recommended against sharing mother's letters with M due to M's age. In a review order entered after the April review hearing, the juvenile court referee found that DHS had made reasonable efforts to reunite the children with mother. The referee noted that mother "is writing letters to [M and J] but [Kubin] has not approved delivery of the letters at this point." "It is unclear why [Kubin] has taken that position and DHS plans to consult with the therapist and facilitate communication between the mother and the therapist." The referee ordered that "DHS shall ensure that [M and J] re-establish contact with the mother as soon as appropriate."

Mother continued writing letters to M and J and requested telephone calls. In early 2014, M made a disclosure of sexual abuse to Kubin. She was evaluated at CARES, a child abuse assessment center, but did not make any further disclosures. After her CARES interview, she regressed significantly toward the behaviors that she had shown when she was first placed with the foster parents. Around the same time, Todd read a letter from mother to M and J. In Kubin's opinion, the children were confused by the letter

and it appeared "to trigger some past anxiety responses" from M and set her back in her progress.

In a permanency order entered in June 2014, the referee continued the permanency plan of reunification and found that DHS had made reasonable efforts to reunite the children with mother. The referee explained that Kubin "is recommending against contact given the reactions of the children, particularly [M], to such contact. DHS is arranging for mother to have a phone contact [with Kubin] to assist both parties to have more understanding of the history and current needs of the children." However, due to Kubin's hours, DHS did not arrange contact between Kubin and mother.

In September 2014, mother pleaded guilty to three counts of identity theft and one count of third-degree assault, and the other charges against her were dismissed. Her probation was also revoked. In all, she was sentenced to 48 months' imprisonment and anticipated being released between late 2015 and mid-2016. She was moved from the Clatsop County Jail to the Coffee Creek Correctional Facility, where there are facilities to allow visits with children.

In November 2014, mother admitted to the following additional jurisdictional allegation: "The mother had a prescription drug problem, which led to criminal activity and incarceration, and the mother has not seen [M and J] since August 2013 and she needs the assistance of DHS to reestablish and redevelop the attachment between the children and herself."

After a permanency hearing in December 2014, the juvenile court referee "defer[red] findings on DHS's efforts to reunify. The parents have essentially been unavailable to participate in services in the community. However, the court has concerns that DHS has not made sufficient efforts to maintain the parent/child bond and to find ways to establish parent/child contact." The referee also found the following:

> "Mother still does not have any visitation with the younger children. * * * There are concerns that [M] reacts strongly to any discussions about her mother, including

experiencing nightmares and significant emotional dysregulation. Her therapist is working with her regarding these issues but is not yet supportive of any contact. Mother and foster parents have written to each other and Mother has sent letters for the children to DHS. Those have not yet been delivered.

"The issue of parent/child contact needs to be addressed. The court has not received information that would lead to the conclusion that contact with mother would be so detrimental that DHS should not allow it. [M's] therapist has advised against contact but it is not at all clear to the court why that recommendation is made and what, if any, work is being done to prepare the child for such contact. The mother's counsel is requesting referral to a therapist skilled at rebuilding parent-child relationships. Given that mother is the legal parent of these children, that the plan remains reunification and that parent/child contact is a critical part of such a plan, this seems a wise course."

The referee ordered DHS to "refer the family to a therapist able to assist mother and children to reestablish relationships, particularly [M and J] with their mother."

DHS did not find a new therapist for M. Instead, the current therapist, Kubin, tried discussing mother with M during therapy sessions. Every time Kubin discussed mother with M, M gave a negative or avoidance response that indicated to Kubin that the subject of mother is one that brings up pain for M. Kubin also showed M a family photo of mother, father, M, and J. M identified herself and J, but was reluctant to acknowledge mother or father in the photo. Kubin told M that the photo would be with the foster mother and that M could look at it any time, but M did not ask to look at it. After Kubin mentioned mother, M regressed toward the behavior that she exhibited when she was first placed with the foster parents, including baby talk and other immature behaviors.

In March 2015, the juvenile court referee held a permanency hearing to consider whether to change the permanency plan to adoption. At the hearing, Todd testified that, although, based on Kubin's recommendation and a Kinship House evaluation of M from August 2014, DHS was still concerned that M was not ready for visits with mother, J could

join C on a visit to mother in the near future.[3] One of Todd's concerns was that, if J visited mother, he might relay information about the visit to M, who would be traumatized.

Todd also testified that, since mother had been moved to Coffee Creek in September 2014, mother had participated in all the services and programs that were available to her, including alcoholics anonymous and narcotics anonymous meetings and a parenting class.

Ultimately, Todd testified, mother would not be released from prison until at least the middle of 2016, and after that, she would need an additional six months to find housing and a job, as well as time to make sure that she would be able to stay drug free, before the children could be returned to her. Given M and J's ages and need for permanency, Todd opined that 18 months would be too long for the children to wait.

Kubin testified about her work with M up to that point. She explained M's avoidance responses when Kubin discussed mother with her, and she recommended that, in light of M's current level of anxiety, which remained high, M "be given a time to heal and develop healthy, strong attachments before" visitation would be appropriate. Mother asked Kubin if she could predict what M's situation would be if she had had an ordinary visitation schedule with mother— one or two visits a week—from the start of the case. Kubin responded that she could not predict that, given the amount of time that had passed and the number of unknown factors.

The juvenile court referee found that DHS had made reasonable efforts to reunify M and J with mother "during the period since the last review/permanency hearing," and that mother had nevertheless failed to make progress sufficient to allow reunification within a reasonable amount of time. In changing the plan to adoption, the referee found that

"it is clear from the testimony received that [M] is suffering from uncertainty about her future and is so impacted by her

_____

[3] C, like J and M, did not visit mother while she was incarcerated in Clatsop County or, at first, after she was transferred to Coffee Creek. He visited her for the first time early in 2015, when she was at Coffee Creek.

early childhood experiences that she is unable to manage any contact with her mother. [J] has spent more than half his life in foster care and has formed healthy and important attachments to his caretakers. He would benefit from an expeditious decision about his permanent placement."

Mother sought a rehearing *de novo* in the juvenile court. *See* ORS 419A.150(7), (8) (within 10 days of entry of a referee's order and findings, a parent "may request rehearing"; "a judge of the juvenile court" conducts the rehearing *de novo*). The rehearing took place in July 2015. At the rehearing, Todd testified that, after the last hearing, she had arranged for J to visit mother once, with C. The visit went well; mother behaved appropriately and assessed what J was comfortable with. After the visit, J regressed, reverting to behaviors like those he showed when he was first placed with the foster parents. M was angry with the foster parents for taking J to visit mother, and she was afraid that they were going to make her see mother as well.

Todd also testified in more detail about mother's progress: In addition to completing the parenting course, mother was going to be the teaching assistant the next time the course was offered; mother was in minimum security and working in an office; mother was hoping to be placed in drug and alcohol treatment soon; and she had no disciplinary reports. Otherwise, the evidence presented was similar to the evidence before the referee.

In its judgment after rehearing, the juvenile court found, among other things, that mother, M, and J "had not developed a meaningful relationship before the mother was incarcerated. The children were traumatized in their mother's care and they continue to suffer from that trauma two years later."[4] It also noted that "DHS did not obtain a therapist skilled at rebuilding the parent-child relationship immediately following the Permanency Judgment dated December 10, 2014, but there has been no finding of 'no

---

[4] On appeal, mother correctly asserts that no evidence supports the juvenile court's finding that mother had not developed a meaningful relationship with the children before she was incarcerated. Mother was M and J's primary caregiver from birth until M was almost 3 and J was almost 2, and nothing in the record supports an inference that they were not bonded to mother when they were removed from her care. Accordingly, we disregard that finding.

reasonable efforts' in this case." The juvenile court affirmed the referee's determination that the permanency plan should be changed to adoption, noting that the referee's order was affirmed "in all respects."

Mother appeals, contending that the court erred in determining that DHS made reasonable efforts and, accordingly, erred in changing the plan from reunification to adoption. She first argues that the referee, and, by extension, the juvenile court, erred in changing the plan based only on the determination that DHS's efforts between January and April 2015 were reasonable. Mother contends that the question before the court at a permanency hearing is whether DHS's efforts were reasonable "over the life of [the] case, in light of the particular circumstances of" the parent and child at issue. *Dept. of Human Services v. S. W.*, 267 Or App 277, 290, 340 P3d 675 (2014).

Furthermore, mother contends that, here, DHS's efforts over the life of the case were not reasonable as a matter of law because DHS cut off all contact between mother and the children for more than a year and then made only four months of efforts toward reunification. Mother asserts that DHS alienated the children from mother by pursuing, for more than a year, a *de facto* plan to have the foster parents adopt the children while the official plan remained reunification. Given that situation, mother contends, more than four months of genuine efforts at reunification were required before DHS could give up on its belated attempt to reunify the family.

"It is the policy of the State of Oregon to offer appropriate reunification services to parents when a child has entered protective custody and a dependency petition has been filed." *State ex rel Juv. Dept. v. Williams*, 204 Or App 496, 500, 130 P3d 801 (2006) (internal quotation marks omitted); *see also* ORS 419B.090(5) ("It is the policy of the State of Oregon, in those cases not described as extreme conduct under ORS 419B.502, to offer appropriate reunification services to parents and guardians to allow them the opportunity to adjust their circumstances, conduct or conditions to make it possible for the child to safely return home within a reasonable time."). Accordingly, DHS must make

reasonable efforts to make it possible for a child to safely return home. *Williams*, 204 Or App at 500; ORS 419B.340(1); ORS 419B.476(2)(a).

At a permanency hearing, the court must evaluate the reasonableness of DHS's efforts:

> "If the case plan at the time of the hearing is to reunify the family, [the court shall] determine whether the Department of Human Services has made reasonable efforts or, if the Indian Child Welfare Act applies, active efforts to make it possible for the ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns."

ORS 419B.476(2)(a). We have explained that that evaluation includes DHS's efforts "over the life of [the] case," *S. W.*, 267 Or App at 290; *see also Dept. of Human Services v. T. S.*, 267 Or App 301, 309 n 5, 340 P3d 142 (2014) (in an appeal of a permanency judgment changing the plan to adoption, rejecting the father's argument that the court should consider only DHS's efforts during the review period at issue—the three months before the hearing; instead considering "all of DHS's efforts during the life of the case" (internal quotation marks omitted)); *id.* at 313 (reversing reasonable efforts determination because DHS "essentially ignored" the father for half of the time between the commencement of the case and the change of permanency plan), with an emphasis on a period before the hearing "sufficient in length to afford a good opportunity to assess parental progress," *State ex rel Dept. of Human Services v. H. S. C.*, 218 Or App 415, 426, 180 P3d 39 (2008) ("DHS is obliged to undertake reasonable efforts to make it possible for the ward to safely return home based on the circumstances existing during the period prior to the permanency hearing and that period must be sufficient in length to afford a good opportunity to assess parental progress.").

"The type and sufficiency of efforts that the state is required to make and whether the types of actions it requires parents to make are reasonable depends on the particular circumstances." *Williams*, 204 Or App at 506

(internal quotation marks omitted). Here, unlike in many of our cases, the parties do not dispute that mother has taken full advantage of the services available to her while she has been incarcerated and, during her incarceration, has consistently sought contact with M and J—by writing dozens of letters whose subject matter is appropriate for the children and repeatedly asking DHS for telephone contact and in-person visitation. DHS has not identified, or sought to remediate, any problems with mother's parenting skills in themselves; rather, her criminal activity and consequent incarceration, as well as the lack of contact with the children, are the cause of the court's jurisdiction. Thus, the question presented here is whether the juvenile court could determine that DHS had made reasonable efforts to facilitate a continuing relationship between mother and the children—because continuing their relationship with mother is essential to allowing the children to safely return home—in light of the particular circumstances and with the children's "health and safety the paramount concerns." ORS 419B.476(2)(a).

As noted above, in the April 2015 permanency order changing the plan to adoption, the referee determined that DHS had made reasonable reunification efforts "during the period since the last review/permanency hearing"—that is, since December 2014—and changed the plan based on that determination. The juvenile court affirmed the referee's order "in all respects," and did not make any additional reasonable efforts findings. However, the period from December 2014 to April 2015 was not sufficient in length to afford a good opportunity to assess the family's progress toward reunification—specifically, to assess the children's progress toward being able to reestablish their relationship with mother. Accordingly, the court erred in failing to consider DHS's efforts over a longer period before deciding whether those efforts were reasonable.

We turn to whether, on this record, the juvenile court could determine that DHS's efforts were reasonable. Even assuming that DHS's efforts before June 2014 were reasonable, its subsequent efforts—which included a six-month period of no reasonable efforts between July and December 2014 and then four months of reasonable efforts after that point—were not. As explained below, the period

of DHS's efforts to reunify the family was too short, in light of DHS's previous failure to make those efforts, to allow the court to meaningfully assess whether the family was making progress toward reunification.

In the December 2014 permanency judgment, the referee did not determine that DHS had made reasonable efforts during the period since the last permanency order, which was entered in June 2014. As set out above, the referee noted M's negative reactions to discussion of her mother, but stated that "[t]he court has not received information that would lead to the conclusion that contact with mother would be so detrimental that DHS should not allow it." It acknowledged Kubin's recommendation against contact, at least with M, but explained that "it is not at all clear to the court why that recommendation is made and what, if any, work is being done to prepare [M] for such contact." In light of the circumstances that "mother is the legal parent of these children, that the plan remains reunification and that parent/child contact is a critical part of such a plan," the court ordered the family to be referred to a therapist skilled at rebuilding parent-child relationships.

Thus, the referee found that, during the period from July 2014 to December 2014, DHS was not making efforts to facilitate contact between mother and M or J. During that time, M continued in therapy and Kubin continued to recommend against any contact with mother, but the referee did not believe that "contact with mother would be so detrimental that DHS should not allow it" and was not persuaded that DHS was actually doing anything to prepare M for contact.[5]

---

[5] We understand the referee's focus on M, rather than J, to reflect the fact that, throughout the case, recommendations against contact between both children and mother have been animated by the possibility of detriment to M from contact with mother rather than concerns that relate specifically to J. The record is much sparser as to any detriment to J from contact with mother. In a Kinship House evaluation of J performed in September 2014, the evaluator noted that some preverbal children are confused by contact with multiple caregivers and that "this at times results in attachment difficulties." Ultimately, the evaluator concluded that, "[g]iven [J's] observed shyness and limited vocabulary, along with lack of contact to date, it does not seem to make sense to re-start phone calls [with mother] at this time" and noted that "there is the possibility that phone calls may cause him to feel anxiety or fear." The speculative possibility of detriment to J from contact with mother did not excuse DHS from taking steps toward

As noted above, mother does not dispute that DHS's efforts between January and April 2015—which included Kubin consistently broaching the subject of mother with M in therapy sessions and looking at a family photo—were reasonable. However, mother contends that that period was not long enough to make DHS's efforts reasonable overall in light of the previous period of insufficient efforts. We agree. The adjudicated bases for jurisdiction as to mother were that she was incarcerated, had a drug problem in the past that led to criminal behavior and incarceration, and needed DHS's help to reestablish a relationship with the children. The juvenile court must evaluate DHS's efforts in light of "the particular circumstances of the case," *Dept. of Human Services v. D. L. H.*, 251 Or App 787, 799, 284 P3d 1233, *modified on recons*, 253 Or App 600, 292 P3d 565 (2012), *rev den*, 353 Or 445 (2013), and, particularly, the adjudicated bases for jurisdiction, *Dept. of Human Services v. N. T.*, 247 Or App 706, 715, 271 P3d 143 (2012) ("The particular issues of parental unfitness established in the jurisdictional judgment provide the framework for the court's analysis of [the sufficiency of DHS's efforts.]"). Given that the children's lack of relationship with mother was among the adjudicated circumstances that endangered them, four months of efforts to rebuild the relationship was not enough to compensate for six months of failure to allow contact or even prepare the children for contact with their mother.

Reversed and remanded.

---

allowing J to have contact with mother while, as the referee pointed out, "mother is the legal parent of these children, * * * the plan remains reunification and * * * parent/child contact is a critical part of such a plan."