***This is a nonprecedential memorandum opinion
pursuant to ORAP 10.30 and may not be cited
except as provided in ORAP 10.30(1).***

Submitted August 30, affirmed September 28, 2022

In the Matter of R. B.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

J. B.,
*Appellant.*

Clackamas County Circuit Court
21JU02748; A178159

Todd L. Van Rysselberghe, Judge.

Shannon Storey, Chief Defender, Juvenile Appellate Section, and Elena Stross, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Erica L. Herb, Assistant Attorney General, filed the brief for respondent.

Before Tookey, Presiding Judge, and Egan, Judge, and Kistler, Senior Judge.

TOOKEY, P. J.

Affirmed.

**TOOKEY, P. J.**

In this juvenile dependency case, father challenges the juvenile court judgment changing the permanency plan for his child, R, from reunification to adoption. On appeal, father argues that the juvenile court erred when it determined that DHS had made reasonable efforts toward reunification and changed the permanency plan. For the reasons that follow, we affirm.

"[O]n appeal of a permanency judgment, the juvenile court's determination whether DHS's efforts were reasonable is a legal conclusion that we review for errors of law." *Dept. of Human Services v. L. L. S.*, 290 Or App 132, 133, 413 P3d 1005 (2018) (brackets and ellipsis omitted). "In conducting that review, we are bound by the juvenile court's explicit factual findings if there is evidence to support those findings," and "we presume that the court made any necessary implicit factual findings in a manner consistent with its ultimate legal conclusion." *Id.* In accordance with that standard, we draw the following facts from "the court's express findings in its opinion, supplementing them with consistent facts drawn from the record, and also from the procedural history of the case." *Id.* at 134.

Father's child, R, was born on June 8, 2021. Hospital tests showed that R was positive for opiates, methamphetamine, and THC. Hospital staff observed a "pretty well used" needle amongst mother and father's belongings, and both parents presented "behavior consistent with being under the influence of controlled substances."

On June 12, 2021, R was discharged from the hospital, and the family returned to the hotel where they were staying. A hospital social worker contacted DHS expressing concern that "[R] would die that night." DHS workers went to the family's hotel room, where they found "drug paraphernalia and residue." R was placed in protective custody that same day.

On June 14, 2021, DHS filed a petition alleging that R was within the juvenile court's jurisdiction under ORS 419B.100(1)(c). On July 13, 2021, the juvenile court held a hearing and found R to be within its jurisdiction based on

the allegation that "father's substance abuse interferes with his ability to safely parent the child" and other bases relating to mother. Father was notified about, but did not attend, the hearing.

On February 11, 2022, the juvenile court held a permanency hearing, which father did not attend. At the hearing, DHS asked the juvenile court to change the permanency plan from reunification to adoption, arguing that father had not made sufficient progress toward ameliorating the basis for jurisdiction despite DHS's reasonable efforts to reunify the family. To prove that it had made reasonable efforts, DHS provided 37 exhibits, DHS and CASA reports, and testimony from a DHS caseworker assigned to R's case. That evidence included the following:

- On June 28, 2021, DHS referred father to "Parrott Creek Child & Family Service" for "Alcohol and Drug Support Services." An outreach worker tried to contact father 11 times by email, phone call, and text message, but father did not respond. About five months later, that referral was closed "due to no contact and lack of engagement with outreach."

- On June 28, 2021, DHS referred father to "Northwest Family Services" for "Front End Intervention." A counselor attempted to contact father 6 times by email, phone call, and text message, but father did not respond. On July 27, 2021, an "Intensive Alcohol and Drug Specialist" notified DHS that father's referral would be closed "due to lack of response from client." On September 28, 2021, DHS reactivated father's referral to Northwest Family Services, and a counselor was able to make contact with father once between October and December 2021, despite repeated attempts.

- In early July 2021, father "le[ft] the state and did not tell anyone." DHS executed multiple "absent parent searches" in an attempt to locate and make contact with him. DHS provided at least one phone to father, but he changed phone numbers "about four times." Father "made contact with [DHS] a

few months later." He explained that he had gone to Arizona "to deposit a settlement check" but was currently in Colorado and planned to return to Oregon in October.[1] DHS was "open and willing to providing parent services" to father in whatever state he was in. DHS also offered to assist father in returning to Oregon, but father declined.

- On September 28, 2021, DHS referred father for services with "Family Skill Builder." On November 29, 2021, that referral was closed "due to lack of engagement/contact" from father.

- On October 4, DHS referred father for services with "STAR" to "get th[e] process going" for "drug and alcohol assessment." In January 2022, STAR closed the referral due to father's lack of engagement and contact. DHS referred father to STAR a second time, but that referral was denied "because of the lack of engagement" by father.

- On October 4, 2021, DHS referred father to "Morrison Child & Family Services" for "Parent Mentoring" services. On November 29, 2021, the referral was closed because the mentor had been "unable to make further contact with [father]."

- On December 14, 2021, DHS notified father that he had missed a permanency hearing. DHS later notified father about a subsequent hearing, but father did not respond to DHS or attend that hearing.

- DHS provided in-person family time with R, but father made "a lot of different excuses as to why [he] couldn't attend." In October 2021, DHS began providing virtual family time, but father missed multiple sessions. In November, DHS "offered to do a makeup family time [session]" when a holiday

_____

[1] A footnote in father's briefing explains that father and mother "went to Arizona in order to deposit a check that mother received as a result of a December 2020 car accident"; that "in July 2021, father became incarcerated in Nevada and was then transferred to Colorado on a warrant"; and that, "[i]n September 2021, parents informed the department that they expected to return to Oregon in the following month."

prevented a session, but father did not respond to that offer. In mid-December 2021, DHS notified father that, due to a "lack of attendance," family time would be suspended; father "only attended 7 percent of the offered family time."

• On January 7, 2022, a DHS report noted that DHS "ha[d] not received any responses or attempts from parents to reach out *** since November 25, 2021."

• In mid-January 2022, DHS sent a "Letter of Expectation" to father, explaining that father was expected to work with "New Season" and "attend all scheduled treatment sessions," "demonstrate sobriety," and provide "clean urinalysis."

• On January 25, 2022, a DHS report noted that "DHS continues to try and build rapport with the parents by continuing to try and reach out."

• In February 2022, DHS received an email from father, stating that he had attended "AA, NA counseling, and other services" out of state. DHS "want[ed] to give [father] credit for those services," but father did not respond to DHS's request for "evidence or records" of father's engagement in those services.

After the parties' closing arguments, the juvenile court ruled that DHS had made reasonable efforts and changed the permanency plan from reunification to adoption:

"I'm satisfied that DHS has *** met its responsibility to *** make reasonable efforts to help the parents get to a place where they need to be[.]

"[T]here's a lot that [mother and father] would need to do to address the drug addiction ***, but they haven't shown an inclination. And while the timeline is shorter than we might see in other cases, I don't see that, based on the lack of efforts made by the parents, that [R] shouldn't be allowed to move forward.

"So the court will find that the plan should be changed from reunification to adoption because, despite the reasonable efforts from reunification by DHS, the child cannot be

safely returned to mother and father * * * within a reasonable time[.]"

Father now appeals, arguing that the juvenile court erred in ruling that DHS's reunification efforts qualified as reasonable and, consequently, erred in ruling to change the permanency plan. DHS responds that the juvenile court did not err, because it made reasonable efforts "by referring father to multiple service providers who all made repeated attempts to contact him," and that, given the "totality of the circumstances, including father's refusal to engage in any services that would lead to reunification, father had sufficient opportunity to demonstrate progress toward ameliorating his substance abuse but failed to do so."[2]

"DHS's efforts toward reunification are reasonable if DHS gives a parent a fair opportunity to demonstrate the ability to adjust his or her behavior and act as a minimally adequate parent." *Dept. of Human Services v. D. M. D.*, 301 Or App 148, 155, 454 P3d 838 (2019) (internal quotation marks omitted). We evaluate DHS's efforts toward reunification "over the entire duration of [a] child's case and under the totality of the circumstances," with "the child's health and safety being the court's 'paramount concerns.'" *Dept. of Human Services v. C. S. C.*, 303 Or App 399, 408, 463 P3d 582 (2020) (quoting ORS 419B.476(2)(a)).

Here, over the approximately eight-month period between R's birth and the permanency hearing at issue, DHS referred father to multiple different service providers, and those providers made repeated attempts to contact and engage father, largely to no avail. After the initial referrals to Parrot Creek and Northwest Family Services were closed due to father's lack of engagement, DHS continued its efforts by making subsequent referrals to other service providers. Additionally, when DHS lost contact with father after he left the state, DHS issued multiple absent parent searches in an attempt to locate and make contact with him. After DHS became aware of father's unannounced departure from the state, DHS offered to assist father in returning to Oregon and was also "open and willing" to provide services to father

---

[2] DHS also contends that father did not preserve the argument he raises on appeal. We reject that contention without discussion.

in whatever state he was in. Relatedly, DHS was willing to give father credit for the services he purportedly attended while out of state, but father did not respond to DHS's request for "evidence or records" of father's engagement in those services. Under the totality of the circumstances, we think DHS gave father "a fair opportunity to demonstrate the ability to adjust [his] behavior and act as a minimally adequate parent." *D. M. D.*, 301 Or App at 155.

Seeking a different result, father advances three arguments as to why, in his view, the juvenile court erred in determining that DHS's efforts were reasonable.

First, father argues that the juvenile court improperly focused on evidence of father's "receptiveness" in determining that DHS's efforts were reasonable. To be sure, "the reasonable efforts inquiry is primarily directed toward DHS's conduct, not the parent's," *Dept. of Human Services v. R. W.*, 277 Or App 37, 44 & n 4, 370 P3d 543 (2016); however, we also consider "whether a parent has attempted to make appropriate changes in his or her life" and "whether parents ignored or refused to participate in plans suggested by the state," *Dept. of Human Services v. S. W.*, 267 Or App 277, 286, 340 P3d 675 (2014); *see also id.* at 292 n 7 ("[A] parent's conduct and response to services that are offered is relevant to the juvenile court's determination of whether DHS has made 'reasonable efforts' under the totality of the circumstances."). Here, in ruling that DHS had made reasonable efforts, the juvenile court observed father's "lack of efforts" and opined that father had not "shown an inclination" to "address the drug addiction." Those observation are both permissible under our caselaw and consistent with the record, which contains little, if any, evidence that father attempted to make changes in his life and shows instead that father largely ignored DHS's multiple referrals for services and the attempts to communicate with him throughout the case.

Second, father contends that DHS failed to show that any of the services it referred would have enabled him to ameliorate his substance abuse. "Whether DHS has provided appropriate services and reasonable efforts should be evaluated in view of the nature of the parent's problems."

*Dept. of Human Services v. T. S.*, 267 Or App 301, 309, 340 P3d 142 (2014) (internal quotation marks omitted). Here, the juvenile court took jurisdiction over R on the basis that "father's substance abuse interferes with his ability to safely parent the child." The record shows that DHS referred father to, among others, the following services: "Parrott Creek" for "Alcohol and Drug Support Services"; "STAR" to "get th[e] process going" for "drug and alcohol assessment"; and "New Season" to "attend all scheduled treatment sessions," "demonstrate sobriety," and provide "clean urinalysis." In addition, though DHS's referral to Northwest Family Services was for "Front End Intervention," because the counselor for that service was an "Intensive Alcohol and Drug Specialist," the trial court reasonably could infer that that service, too, related to substance abuse. Thus, evaluated in view of father's problems, the record shows that DHS provided "appropriate services"—*i.e.*, services aimed at ameliorating father's substance abuse.

Third, father contends that DHS "did not make any efforts that were directed at the jurisdictional basis until four months before the permanency hearing" and, therefore, did not make efforts "for a period of time that was sufficient in length." In support of that contention, father cites two cases in which we reversed a permanency judgment—*State ex rel Dept. of Human Services v. Shugars*, 208 Or App 694, 145 P3d 354 (2006), and *State ex rel Dept. of Human Services v. H. S. C.*, 218 Or App 415, 180 P3d 39 (2008).

We disagree with that contention. For one, the record shows that DHS offered services as early as June 2021—nearly eight (not four) months before the permanency hearing. In addition, both cases cited by father are inapposite: In contrast to this case, in both *H. S. C.* and *Shugars*, where we reversed the permanency judgments, the parents had, in fact, engaged with the services offered by DHS, but only for a short period, and we held that they should have been allowed additional time to demonstrate sufficient progress. *See Shugars*, 208 Or App at 717 ("[M]ost of the services provided to parents took place in the four months immediately preceding the permanency hearing," and "both service providers had limited opportunity to work with the family[.]

\* \* \* Expecting parents to consistently apply and perfect newly learned parenting skills within a few weeks \* \* \* is unrealistic."); *H. S. C.*, 218 Or App at 426 ("[In October 2006], Father engaged with Goodwill Industries and \* \* \* parenting and mental health services," but, after the father was detained by ICE, "DHS ceased offering father any services" and did not "endeavor to inquire into the possibility of father completing his counseling and other requirements while in detention."). Further, though we have said that, to be reasonable, DHS's efforts "must go on long enough to allow for a meaningful assessment of whether parents are making sufficient progress to permit reunification," *Dept. of Human Services v. L. M. K.*, 319 Or App 245, 252-53, 510 P3d 278 (2022), we have also explained that, "[w]hen a parent \* \* \* has demonstrated an unwillingness to participate in programs, DHS may reasonably stop providing those services, or decide not to provide others." *T. S.*, 267 Or App at 310. Here, between June 2021 and February 2022, DHS referred father to multiple different services to help facilitate his reunification with R, and DHS only decided to cease those efforts after an approximately eight-month period of time had elapsed during which father demonstrated an unwillingness to participate in those services.

Given the foregoing, we conclude that, under the totality of the circumstances, DHS gave father a fair opportunity to demonstrate the ability to adjust his behavior and act as a minimally adequate parent; therefore, the juvenile court did not err in concluding that DHS's efforts were reasonable.[3]

Affirmed.

---

[3] Our conclusion that DHS's efforts were reasonable should not be read to suggest that DHS's efforts in this case were only minimally adequate as a matter of law; rather, under the circumstances, we think that DHS's efforts were more than sufficient to qualify as "reasonable."